IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COREY MOORE,

     Plaintiff,

v.

CITY OF ATLANTA, GEORGIA
and DARIN SCHIERBAUM,
*individually*,

     Defendants.

CIVIL ACTION FILE NO.

1:20-cv-3380-JPB-JKL

## FINAL REPORT AND RECOMMENDATION

This is an employment action in which Plaintiff Corey Moore, an officer with the Atlanta Police Department, alleges that Defendants City of Atlanta, Georgia (the "City") and Darin Schierbaum discriminated against him on the basis of his race and retaliated against him for engaging in protected activity. In doing so, Plaintiff contends that the City violated Title VII of the Civil Rights Act of 1964 ("Title VII"), and that both Defendants violated 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the "EPC"). [*See* Doc. 1 (Compl.).] The case is presently before the Court on Defendants' motion for summary judgment. [Doc. 62.] For the following reasons,

the undersigned **RECOMMENDS** that the motion for summary judgment be **GRANTED IN PART AND DENIED IN PART**.

## I.     BACKGROUND

### A.     Consideration of Facts

The Court draws many of the facts in the following summary from the uncontested portions of Defendants' Statement of Undisputed Facts ("DSUMF") [Doc. 62-2], and Plaintiff's Statement of Additional Material Facts ("PSAF") [Doc. 66].  The undersigned has also considered Plaintiff's responses to Defendants' Statement of Undisputed Material Facts ("R-DSUMF") [Doc. 71], Defendants' responses to Plaintiff's Statement of Additional Material Facts ("R-PSAF") [Doc. 81-2], and Defendants' reply to Plaintiff's responses ("Rep-DSUMF") [Doc. 81-1].

Where possible, the Court has relied on the parties' statements of facts and responses.  The Court does not rule on each and every objection or dispute presented by the parties in this report and recommendation, and discusses objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.  The Court has also conducted its own review of the materials submitted in support, including the depositions and declarations filed in

this case, and includes facts drawn from its independent review of the record.  *See* Fed. R. Civ. P. 56(c)(3).

The facts are presented in the light most favorable to Plaintiff.  *See Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). Where there is a conflict in the evidence, the Court accepts Plaintiff's evidence as true because he is the non-moving party.  *See Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) ("If there is a conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor.").  Where the party responding to a statement has neither refuted nor stated valid objections to the material facts as set forth in the statement, those facts are deemed admitted by operation of law.  LR 56.1B(2), NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1267-69 (11th Cir. 2008).  In those instances where a party denies a statement of fact (in whole or in part), the Court has reviewed the record to determine whether it is disputed and, if so, whether any dispute is material. Additionally, the Court includes some facts drawn from its independent review of the record.  *See* Fed. R. Civ. P. 56(c)(3).  The Court has also excluded assertions of fact by either party that are immaterial or presented as arguments or legal

conclusions, as well as assertions of fact unsupported by a citation to evidence in the record, stated as a legal conclusion, or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B(1), NDGa.; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc) (subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact to withstand summary judgment); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (same).

### B.   Factual Summary

#### 1.   Plaintiff and Defendants

The City of Atlanta Police Department ("APD") employs Police Officers of various ranks, including Officers, Sergeants, Lieutenants, Captains, Majors, Deputy Chiefs, Assistant Chiefs, and a Chief of Police.[1]  (Dep. of Erika Shields [Doc. 76] 21-22; DSUMF ¶ 1; R-DSUMF ¶ 1.)  All Police Officers are provided with training on various topics—including, as relevant here, training about processing vehicles, fingerprinting, firearms, criminal procedure, city ordinances, and use of force.  (DSUMF ¶ 4.)  Members of the command staff, which includes

---

[1] The foregoing list appears to be organized from lowest rank to highest. (*See* DSUMF ¶¶ 6, 11, 13, 15, 19, 23 ("Sergeants report to Lieutenants," "Lieutenants report to Captains," "Captains report to Majors," and so on.).)

the ranks of Captain and above (and thus, included Defendant Schierbaum because he was a Major), are appointed by the Chief of Police and are sometimes referred to as "white shirts," for the executive-colored shirts they wear.  (Dep. of Corey Moore [Doc. 63 ("Pl. Dep.")] 36, 105; Dep. of Hajredin Zenelaj [Doc. 77] 59; Dep. of Carven Tyus [Doc. 79] 48.)

Plaintiff was hired by APD in August 2008, and after completing police academy training roughly a month later, began working as a Police Officer. (DSUMF ¶ 3; PSAF ¶ 1.)  In June 2017, almost a decade later, Plaintiff was promoted to Sergeant.  (DSUMF ¶ 5; PSAF ¶ 2.)  The Sergeant job description states that Sergeants "[use] independent judgment and discretion in the handling of emergency situations, determining and deciding upon procedures to be implemented, setting priorities, maintaining standards and resolving problems." (PSAF ¶ 45.)  Lieutenant Daniel Genson became Plaintiff's supervisor on May 31, 2018, and supervised Plaintiff for approximately five or six months.  (DSUMF ¶¶ 7, 8.)   Lieutenant Jeffery Brauninger next supervised Plaintiff, starting on November 1, 2018, and did so until around February 2019.  (DSUMF ¶¶ 9, 10.)

Patrol officers who respond to 911 calls work in the Field Operations division, which is itself organized into six zones.  (DSUMF ¶ 2.)   Upon his

5

promotion to Sergeant, Plaintiff was assigned to Zone 5 of the Field Operations. (PSAF ¶ 3.)  Defendant Schierbaum—an openly gay, white man who currently serves as the Chief of Police for APD—was the Major in charge of Zone 5 during the time Plaintiff was a Sergeant there.  (PSAF ¶ 3; DSUMF ¶ 14.)

Jeffrey Glazier (a white man) was the Deputy Chief of the Field Operations Division; Rodney Bryant (a black man) and Todd Coyt (also a black man), were Assistant Chiefs; and Erika Shields (a white woman) was the Chief of Police during that same period.[2]  (DSUMF ¶¶ 16, 20, 24; Dep. of Jeffrey Glazier [Doc. 73] 190-91; Shields Dep. 147, 164.)

## 2.    OPS Complaint Process

The Office of Professional Standards ("OPS") receives complaints about APD employee misconduct from citizens and employees of the City.  (DSUMF ¶ 26.)  Upon receipt of a complaint, OPS is supposed to conduct a preliminary investigation to determine if the issues identified rise to the level of an OPS complaint and warrant further investigation.  (DSUMF ¶ 27; R-DSUMF ¶ 27.)  An

---

[2] For ease of reference, the Court will refer to the officers' titles as they were during the events of the case, with the sole exception of Defendant Schierbaum. The Court will follow the parties' lead in using "Defendant Schierbaum" for him, rather than Major Schierbaum.

OPS Investigator investigates the complaint by interviewing witnesses, collecting and reviewing evidence, and taking statements.  (DSUMF ¶¶ 28, 29.)  That role is entirely factfinding, and an OPS investigator does not actually determine whether violations of work rules or City ordinances have occurred.  (DSUMF ¶ 30.)  Instead, after completing fact-gathering and then summarizing the investigation, the OPS Investigator then sends the file to a Lieutenant assigned to OPS, who determines if a work rule or legal violation has occurred.  (DSUMF ¶¶ 31, 32.)  An OPS Major reviews all OPS investigations for correctness and to concur, or not, with the recommended disposition.  (DSUMF ¶ 34.)  OPS may find that alleged violations are "sustained," "not sustained," "exonerated," "unfounded," or "exceptionally closed."  (DSUMF ¶ 33.)  After OPS completes an investigation, the OPS investigation file is sent to the employee's chain-of-command to determine what discipline is appropriate, but OPS does not itself impose disciplinary actions. (DSUMF ¶¶ 35, 36; PSAF ¶ 89.)

### 3.  APD Policies

APD maintains work rules with which all employees are expected to comply. (DSUMF ¶¶ 37, 38; R-DSUMF ¶ 37.)  Among others, and as relevant to this case, APD policies include the following rules:

- Work Rule 4.1.1, which requires employees "respond in an appropriate manner to all situations";

- Work Rule 4.2.3, which requires "[s]upervisory employees . . . [to] enforce the rules and regulations of [APD] and . . . ensure the proper conformity to [APD] policies and procedures" and to "take immediate, appropriate action(s) when the conduct of any employee is contrary to the public interest or the good reputation and proper operation of [APD]"[3];

- Work Rule 4.2.33, which requires "[e]mployees . . . to familiarize themselves with, and conform to, the rules, regulations, directives, and standard operating procedures of [APD]"; and

- Work Rule 4.2.37, which requires "[e]mployees to maintain sufficient competency to perform their duties and assume the responsibilities of their position."

(DSUMF ¶¶ 40-43.)  Further, APD policies provide that:

Unsatisfactory performance may be demonstrated by lack of knowledge of the application of the laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to conform to work standards established for the employee's rank, grade, or position; the failure to take appropriate action on the occasion of a situation or incident deserving a public safety employee's attention; absence without leave; or unexcused absence from a duty assignment during a tour of duty.

(DSUMF ¶ 44.)

---

[3] Employees' "supervisors are responsible for ensuring that all employees comply with work rules."  (DSUMF ¶ 39 (internal marks removed).)

8

APD has a disciplinary process in place, which is intended "to prevent and correct inappropriate behavior." (DSUMF ¶ 45.) The disciplinary process recognizes progressive discipline, but "provides consideration for mitigating and/or aggravating factors," including "employee intent, past performance, degree of culpability, discipline history, severity of infraction, acceptance of responsibility by the employee and other relevant factors." (DSUMF ¶ 46.) When the violation of a work rule is "sustained," APD policy places the violation in a category ranging from "A" to "D," with "B," "C," and "D," each representing increasingly more serious types of misconduct; additionally, the combination of violations may "justify a more severe disciplinary action." (DSUMF ¶¶ 47-49.) APD policies provide guidance on "disciplinary ranges"—including oral admonishment, written reprimand, suspension, demotion, and dismissal—for various violations; however, the Chief of Police retains authority to take any disciplinary action that he or she "deems necessary." (DSUMF ¶¶ 51-52.) For each category of violation, APD policy allows for the following discipline:

- Category A violations—an oral admonishment or a written reprimand;

- Category B violations—a written reprimand or a suspension up to three days;

- Category C—a suspension of four to 15 days or demotion;

- Category D—a suspension of 16 to 30 days, demotion, or dismissal.

(DSUMF ¶¶ 53-56.)  As it will be relevant below, the failure to properly supervise subordinates pursuant to Work Rule 4.2.3 may be categorized under any of the four levels of seriousness.  (DSUMF ¶ 50.)

APD policy itself categorizes oral admonishments and written reprimands as "non-adverse disciplinary actions."[4]  (DSUMF ¶ 64; R-DSUMF ¶ 64.)  In any event, this fact is relevant because only "adverse disciplinary actions"—which, under APD policy, include suspensions without pay, demotions, and dismissals—are appealable, and may be appealed by the filing of a Notice of Appeal with the Civil Service Board ("CSB").  (DSUMF ¶¶ 65-67.)  The CSB is "the official protector of the civil service system" and is vested with the power to "hold hearings when requested . . . on final demotions, suspensions, dismissals or other such adverse actions."  City of Atlanta Code of Ordinances, § 114-79.  The CSB has the "power to make final determinations and dispositions in such matters," and "[t]he decision of the hearing officer/panel [is] binding on both parties."  *Id.* §§ 114-79(e)(2), 114-553(b).

---

[4] Of course, this fact does not establish their materiality from a legal standpoint.

### 4.     Plaintiff's Employment as Sergeant

Plaintiff worked as a Sergeant from June 8, 2017, until October 21, 2019, when he was demoted from Sergeant to Police Officer.  (DSUMF ¶ 68.)  As noted above, he was assigned to work in Zone 5 during that time.  (DSUMF ¶ 69.) Plaintiff was initially assigned to work on the Morning Watch shift, which is scheduled overnight from 10:00 p.m. to 6:00 a.m. (DSUMF ¶ 70), and responded to a number of incidents, including shootings, robberies, car accidents, car break-ins and other thefts.  (DSUMF ¶ 73.)  As a Sergeant, Plaintiff also had supervisory responsibilities, including the expectation that he would "work under very general supervision" and "use independent judgment and discretion in the handling of emergency situations."  (DSUMF ¶ 76 (cleaned up).)

### 5.     OPS Investigations into Plaintiff

Plaintiff was the subject of five OPS investigations during his time as a Sergeant.  (DSUMF ¶ 79.)  Four of the five OPS "packages"—as they are referred to—are from 2017 and 2018, though the first of those was not fully adjudicated until January 2019.  (PSAF ¶¶ 4-5.)  The incidents leading to those investigations, as well as the investigations, are recounted below.

11

### a. August 2017 Accident

On August 26, 2017, after gun shots were reported in the area, Plaintiff responded to a traffic accident at the intersection of Marietta Street and Ivan Allen Boulevard. (DSUMF ¶ 80; Pl. Dep. Ex. 14 at CITY 1943-52.) Plaintiff was a supervisor at the scene of the accident. (DSUMF ¶ 82; R-DSUMF ¶ 82.)

The nephew of another officer, Sergeant Janice Sturdivant, was the driver of vehicle that caused the accident; he told Plaintiff that "someone was shooting at him," and that as a result, he entered the intersection on red, causing the accident. (Pl. Dep. 64-65.) The car had been damaged, with the rear window blown out and bullet holes in the windshield[5] and tires. (*Id*. 70-74, Ex. 14.) However, Plaintiff

---

[5] Images of the vehicle's windshield were admitted at Plaintiff's deposition:

 

(*See* Pl. Dep., Ex. 14 at CITY 2013, CITY 2015.)

12

could not recall if anyone at the scene had noticed the holes, and reported not having seen them himself, though he also admitted that he might have missed them. (DSUMF ¶ 81; R-DSUMF ¶ 81; Pl. Dep. 70-73; *see also* Pl. Dep. Ex. 14 at 1945-53 (investigative reports).)  Sergeant Sturdivant, meanwhile, reported that the only person who saw the bullet holes around the time of the accident was the tow-truck driver, who forwarded images to Sergeant Michael Peters, who in turn ordered a supplemental report completed.[6]  (Pl. Dep. Ex. 14 at CITY 1945-46.)  Additionally, there was an Uber driver at the scene that came forward as a witness; however, he was not even identified in the accident report.  (*Id.* at CITY 1948, 1951.)

On November 9, 2017, OPS opened an investigation into the accident (the "2017 OPS Complaint"), after receiving a complaint.  (DSUMF ¶ 84; R-DSUMF ¶ 84.)  Plaintiff was not initially accused of wrongdoing.  (DSUMF ¶ 85.) Regardless, OPS Investigator James Battle was assigned to conduct an investigation, and as part of his investigation, he interviewed Plaintiff.  (DSUMF

---

[6] Sergeant Sturdivant was not disciplined for this incident (PSAF ¶ 7); however, Sergeant Sturdivant was on the scene in her personal capacity as the victim's aunt, and not as an APD officer (Pl. Dep. Ex 14 at CITY 1934 ("Sergeant Sturdivant stated that she never got out to look at the vehicle because she did not want to compromise the investigation and she was just there to pick up her child and make sure he was okay.")).

¶¶ 86-88.)  During the interview, Plaintiff acknowledged that the driver stated that he had been shot at, that Plaintiff had not noticed bullet holes in the vehicle, and that a witness—the Uber driver—was not listed in the accident report.  (DSUMF ¶¶ 89-92; R-DSUMF ¶¶ 89-92.)

When OPS Investigator Battle completed his investigation, he provided an Investigative Summary for the 2017 OPS Complaint to OPS Lieutenant Hajredin Zenelaj.  (DSUMF ¶ 93.)  OPS Lieutenant Zenelaj (a white man) reviewed the fact-finding investigation and determined that Plaintiff had violated of APD work rule 4.2.3, relating to responsibilities of supervisors.  (DSUMF ¶ 94; Shields Dep. 164.) OPS Lieutenant Zenelaj drafted and provided investigative findings for the 2017 OPS Complaint to OPS Major Carven Tyus (a black man), which indicated that Plaintiff had violated of APD work rule 4.2.3.  (DSUMF ¶ 95.)  OPS Major Tyus then reviewed those investigative findings, and approved OPS Lieutenant Zenelaj's determination.  (DSUMF ¶ 96.)  OPS Major Tyus requested that Plaintiff's chain-of-command complete an Employee Discipline Worksheet, which is used to "determine the complaint category for sustained work rule violations" and to "make specific discipline recommendations for each sustained work rule violation." (DSUMF ¶¶ 97, 98 (cleaned up).)  Following the OPS investigation, Captain

14

Richard Vasquez recommended issuing an oral admonishment to Plaintiff for violation of APD work rule 4.2.3; and after Defendant Schierbaum reviewed the OPS investigation, he concurred with Captain Vasquez's recommendation. (DSUMF ¶¶ 100-01.)

Plaintiff filed a grievance related to the 2017 OPS Complaint.  (DSUMF ¶ 103.)  Defendant Schierbaum responded to Plaintiff's grievance, explaining that he did "not see any grounds which support the changing of the disposition to Exonerated."  (DSUMF ¶ 104.)  Plaintiff also sent his grievance to Deputy Chief Glazier, who similarly responded by informing Plaintiff that there was sufficient evidence that Plaintiff violated APD work rule 4.2.3 because Plaintiff was the on-duty supervisor who responded to the scene and had the responsibility to ensure a thorough investigation of the accident scene and documentation of facts by the reporting officer, which did not occur.  (DSUMF ¶ 106.)  Finally, Assistant Chief Bryant also responded to Plaintiff's grievance, and denied Plaintiff's request to modify the original disposition of the complaint.  (DSUMF ¶ 108.)  In the end, Plaintiff received an oral admonishment related to the 2017 OPS Complaint. (DSUMF ¶ 107; R-DSUMF ¶ 107.)

### b.    May 2018 Altercation

The next incident occurred in May 2018.  Specifically, on May 3, 2018, Plaintiff responded to a call from Club Opium, where another APD Sergeant was working at an approved off-duty job.  (DSUMF ¶ 110.)  That off-duty Sergeant allegedly placed a bar patron in a chokehold and slammed him onto the ground after a fight broke out at the bar.  (DSUMF ¶ 111.)  A citizen complained, and OPS opened an investigation (the "May 2018 OPS Complaint").  (DSUMF ¶ 112.)  As before, the initial complaint did not identify Plaintiff as the accused officer. (DSUMF ¶ 113.)  OPS Investigator Art Nixon was assigned to conduct the investigation, and as part of his fact-finding, he interviewed Plaintiff.  (DSUMF ¶¶ 114-16.)  OPS Investigator Nixon determined that Plaintiff did not activate his body-worn camera during the incident and did not complete a use-of-force report. (DSUMF ¶ 117; R-DSUMF ¶ 117.)  Accordingly, when OPS Investigator Nixon provided an Investigative Summary to OPS Lieutenant Zenelaj, OPS Lieutenant Zenelaj determined that Plaintiff had violated APD work rule 4.2.33, pertaining to conformance to directives, based upon his failure to activate his body worn camera or complete a use-of-force report.  (DSUMF ¶¶ 118, 121.)  OPS Major Tyus

16

reviewed the investigative findings, and approved OPS Lieutenant Zenelaj's determination.  (DSUMF ¶ 122.)

OPS Major Tyus thereafter requested that the chain-of-command complete an Employee Discipline Worksheet (DSUMF ¶ 122), and Defendant Schierbaum recommended issuing an oral admonishment and a written reprimand to Plaintiff for two violations of APD work rule 4.2.33 (DSUMF ¶ 123).  Deputy Chief Glazier also reviewed the OPS investigation and concurred with Defendant Schierbaum's discipline recommendations.  (DSUMF ¶ 124.)

Plaintiff filed another grievance related to the May 2018 OPS Complaint, requesting that the disposition of the investigation be changed from "Sustained" to "Exonerated."  (DSUMF ¶ 125.)  Assistant Chief Bryant responded to Plaintiff's grievance by informing Plaintiff that the charges for violations of APD work rule 4.2.33 would be modified from "Sustained" to "Not Sustained."  (DSUMF ¶ 126; PSAF ¶ 10.)  As a result, Plaintiff did not receive any discipline related to May 2018 OPS Complaint.  (DSUMF ¶ 127.)

### c.    **August 2018 Shooting**

On August 24, 2018, Plaintiff and other Zone 5 units were dispatched to the house of an off-duty police officer, Annie Williams, and her boyfriend, in response

Case 1:20-cv-03380-JPB   Document 82   Filed 12/19/22   Page 18 of 101

to a 911 call. (DSUMF ¶¶ 131-32.) Officer Williams claimed to have accidentally shot herself in the hand while cleaning a gun inside her residence. (DSUMF ¶ 133.) When Plaintiff arrived at the scene, Officer Williams was sitting outside on the porch; and despite admitting that the gun discharged in her residence, she would not let anyone go inside, which Plaintiff found odd. (DSUMF ¶¶ 134-35.) But because Officer Williams and her boyfriend stated that the injury was the result of an accident, Plaintiff did not believe the incident was a "crime scene." (DSUMF ¶ 136; Pl. Dep. 117.)

Plaintiff was the highest-ranking officer on scene at Officer Williams' house,[7] and contacted his supervisor, Lieutenant Genson. (R-DSUMF ¶ 116-17.) According to Plaintiff, he reported that Officer Williams would not let police into her house and asked whether Lieutenant Genson wanted to secure a warrant to search the residence; however, after Plaintiff explained that both Williams and her

---

[7] Plaintiff contends that Captain Chris Moorman, the Night Commander, was actually the highest-ranking officer for the incident, as he was present at the hospital with Officer Williams and spoke with her there. (*See* Pl. Dep. 103, Ex. 32.) As a result, he believes that Captain Moorman was responsible for ensuring all policies and procedures were followed with respect to this incident. (DSUMF ¶ 139.)

boyfriend stated that the incident was an accident, Genson declined to sign off on a warrant for her residence.  (DSUMF ¶ 138; Pl. Dep. 116-117.)

A few days later, on August 28, 2018, OPS opened an investigation into the shooting incident at Officer Williams's residence (the "August 2018 OPS Complaint"), which did not initially accuse Plaintiff of wrongdoing.  (DSUMF ¶¶ 140-41.)   OPS Investigator Michael Clayton was assigned to conduct the investigation, and as part of his fact-finding, interviewed Plaintiff.  (DSUMF ¶¶ 143-44.)   OPS Investigator Clayton determined that Plaintiff was the highest-ranking officer at the scene, that Plaintiff did not activate his body worn camera during the incident, that an investigation was not requested, that attempts were not made to locate additional witnesses or injured persons, that photos were not taken of the scene or Williams's injury, and that no search warrant was obtained for the residence.  (DSUMF ¶¶ 145-46.)  Based upon all of this, Plaintiff was added to the August 2018 OPS Complaint.  (*Id*.)

OPS Investigator Nixon provided an Investigative Summary to OPS Lieutenant Zenelaj.  (DSUMF ¶ 147.)  Lieutenant Zenelaj determined that Plaintiff had violated APD work rules 4.2.33, relating to conformance to directives, and 4.2.37, relating to unsatisfactory performance, because Plaintiff did not take steps

necessary to ensure the scene was secured for investigation; did not process the crime scene appropriately (including failing to interview or document names of witnesses, ensure photographs were taken, or make proper notifications to the appropriate entities for investigation); and did not ask the officers appropriate questions to ensure a comprehensive investigation occurred.  (DSUMF ¶ 148.) OPS Major Tyus again reviewed the investigative findings, and approved the determination.  (DSUMF ¶¶ 149-50.)

OPS Major Tyus requested that the chain-of-command complete an Employee Discipline Worksheet (DSUMF ¶ 151; Pl. Dep. Ex. 16 at CITY 2152), and on May 14, 2019,[8] Defendant Schierbaum recommended issuing a 15-day suspension[9] to Plaintiff (DSUMF ¶ 152; PSAF ¶¶ 15-16).  Deputy Chief Glazier reviewed the OPS investigation as well, and concurred with Defendant Schierbaum's recommendation.  (DSUMF ¶ 153.)  Assistant Chief Coyt also concurred with the recommendation, believing Plaintiff to have failed in securing

---

[8] This is the same day Defendant Schierbaum would also recommend that Plaintiff be demoted in relation to another incident.  (PSAF ¶ 15.)

[9] Defendant Schierbaum assigned Category C punishment for the incident. (PSAF ¶ 16.)  As noted above, a 15-day suspension is the maximum duration allowed under that category (*id.*; DSUMF ¶ 55), though demotion is also allowed for Category C violations (DSUMF ¶ 55).

and processing the investigation scene, when among other things, he did not enter or investigate the area where the shooting had occurred and failed to check adjacent units to ensure no damage or injury had taken place there.  (DSUMF ¶ 154; Coyt Decl. [Doc. 62-15] ¶ 6.)

A Notice of Proposed Adverse Action ("NPAA") was issued to Plaintiff in relation to the August 2018 OPS Complaint, indicating that a 15-day suspension was the proposed discipline.  (DSUMF ¶ 157.)  Deputy Chief Glazier subsequently withdrew the NPAA, however, and asked OPS to conduct further investigation due to allegations Plaintiff raised regarding Night Commander Moorman's involvement and responsibility.  (*Id.*)  OPS conducted a supplemental investigation, and at its conclusion, another NPAA was issued to Plaintiff, which again proposed a 15-day suspension as discipline for the August 2018 OPS Complaint.  (DSUMF ¶ 159.)  A Notice of Final Adverse Action ("NFAA") was then issued, which included a 15-day suspension starting October 21, 2019.  (DSUMF ¶¶ 160-61.) And while Plaintiff appealed the suspension to the CSB and was heard by a three-member panel, the CSB upheld Plaintiff's suspension.  (DSUMF ¶¶ 162-65.)

### d.   September 2018 Unlawful Arrest

On September 4, 2018, Plaintiff responded to a traffic stop on Larkin Place, where an officer needed assistance.  (DSUMF ¶ 166.)  When Plaintiff arrived at the scene, a citizen was in the back seat of the officer's vehicle after being detained because her signature on the citation did not match her signature on her driver's license.  (DSUMF ¶ 167.)

Plaintiff himself filed a complaint with OPS regarding the incident, and on September 17, 2018, OPS opened an investigation (the "September 2018 Complaint").  (DSUMF ¶ 168.)  OPS Investigator Clayton was assigned to conduct the fact-finding investigation, and interviewed Plaintiff as part of it.  (DSUMF ¶¶ 169-72; *see also* Pl. Dep. Ex. 18.)  Following that interview and a review of footage from the incident, OPS Investigator Clayton determined that Plaintiff was the ranking supervisor on the scene, that he again failed to activate his body-worn camera, and that the arrest did not appear lawful; as a result, Plaintiff was added as an accused to the September 2018 OPS Complaint.  (DSUMF ¶¶ 173-74.)  Plaintiff contacted Investigator Clayton to asked why he was identified as an accused. (DSUMF ¶ 175.)  OPS Investigator Clayton informed Plaintiff that it was because the incident was "significant in nature" and Plaintiff was the Sergeant on the scene.

22

(DSUMF ¶ 176.)  In response, Plaintiff complained that he had been "unjustly made the accused" a second time.  (DSUMF ¶ 177.)

OPS Investigator Clayton provided an Investigative Summary for the September 2018 OPS Complaint to OPS Lieutenant Zenelaj.  (DSUMF ¶ 178.) Lieutenant Zenelaj determined that Plaintiff violated APD work rules 4.2.3, relating to responsibilities of supervisors, and 4.2.33, relating to conformance to directives, for failing to activate his body-worn camera.  (DSUMF ¶ 179.) Lieutenant Zenelaj drafted and provided his investigative findings to OPS Major Tyus, who reviewed the investigative findings, and approved Lieutenant Zenelaj's determination.  (DSUMF ¶¶ 180-81.)

OPS Major Tyus thereafter requested that the chain-of-command complete an Employee Discipline Worksheet (DSUMF ¶ 182), and Defendant Schierbaum recommended issuing a written reprimand for violating APD work rule 4.2.3, and a one-day suspension for violation of APD work rules 4.2.33 (DSUMF ¶ 183). Deputy Chief Glazier and Assistant Chief Coyt also reviewed the OPS investigation and concurred with Defendant Schierbaum's recommendation to issue a written reprimand and 1-day suspension to Plaintiff.  (DSUMF ¶¶ 184-85.)

An NPAA was issued to Plaintiff related to the September 2018 OPS Complaint, calling for a 1-day suspension for violating APD work rule 4.2.33 as the proposed discipline.  (DSUMF ¶ 186.)  Plaintiff responded to the NPAA and requested exoneration, and the suspension was reduced to a written reprimand. (DSUMF ¶¶ 187-88.)  Despite the downward departure, Plaintiff still filed a grievance, and sent Deputy Chief Glazier two letters asking for exoneration and withdrawal of the reprimand.  (DSUMF ¶¶ 189-90.)  Both Deputy Chief Glazier and Defendant Schierbaum responded to the grievance, and both found that the grievance failed to provide any new grounds for modifying the violation found or the discipline based upon it, leaving the written reprimand to stand.  (DSUMF ¶¶ 191-92.)

### e.    January 2019 Kidnapping

Around midnight on January 22, 2019, four Georgia Tech students were kidnapped at a local Krispy Kreme.  (PSAF ¶ 31.)  Two suspects brandished a gun, forced the students into their vehicle, and then ordered the students to drive to an ATM to withdraw money.  (DSUMF ¶ 194.)  Once the suspects got out of the vehicle, the students drove to the Georgia Tech police station to report the incident, at which point the Georgia Tech police contacted APD.  (DSUMF ¶¶ 195-96; PSAF

¶¶ 31-32.)  Two APD Police Officers, Dwayne Dejonge (a black man) and Reneka Burleigh (a black woman), reported to the Georgia Tech police station and contacted Plaintiff, their supervisor.  (DSUMF ¶¶ 197-98.)  Meanwhile, Officer Burleigh also contacted the General Investigations Squad ("GIS")[10] after she arrived at the scene of the Georgia Tech incident; however, GIS was unavailable to report because it was already busy responding to a sexual assault elsewhere. (DSUMF ¶¶ 202-03; *see also* PSAF ¶¶ 35, 37; R-PSAF ¶ 37.)  The GIS investigator did instruct the officers to "get your victim statement" and "make sure we canvas those areas for video cameras."  (PSAF ¶ 38.)

After receiving the officers' call, Plaintiff reported to the scene.  (DSUMF ¶ 199; PSAF ¶ 40.)  He also contacted the Night Commander,[11] Lieutenant Furdge Turner, but the Night Commander was not available to report to the scene because he was responding to a homicide.  (DSUMF ¶ 200-01, R-DSUMF ¶¶ 200; PSAF ¶¶ 41, 43; Schierbaum Dep. 41.)  Because the Night Commander and GIS were

---

[10] According to APD SOPs, GIS is responsible for monitoring and responding to officers' requests for assistance for major crimes and felonies overnight between midnight and 8:00 am.  (PSAF ¶¶ 35-36.)

[11] The Night Commander, by SOP, is to "[o]versee field operations and provide command level supervision at all significant events."  (PSAF ¶ 42.)

25

unavailable, Plaintiff was the supervisor and highest-ranking officer at the scene.[12]

(Glazier Dep. 88-90; Shields Dep. 47; Schierbaum Dep. 38, 68; PSAF ¶ 44.)

At the Georgia Tech police precinct, officers obtained statements from the students, learned that an ATM may have security footage of one of the perpetrators, and recovered a cellphone "believed to be owned by one of the suspects" that was "turned into property as evidence." (PSAF ¶ 46.) The vehicle used in the crime was parked in the parking lot at the Georgia Tech police station; however, Plaintiff did not direct Officers Dejonge or Burleigh to process the vehicle for fingerprints. (DSUMF ¶¶ 206-07.) According to his statements during an interview about the event, he considered it a "a matter for the GIS," even though GIS was not present or available. (Pl. Dep. Ex. 22 at CITY 2556.) Plaintiff also failed to separate the witnesses or obtain individualized witness statements, instead relying on a group

---

[12] Plaintiff disputes Defendants' statement that Plaintiff was "solely responsible for the investigation," and points to APD SOPs that require GIS to assist with investigations into major crimes and the Night Commander to oversee and supervisor significant events during the shift in question. (*See* R-DSUMF ¶ 204.) The Court does agree that there appears to be some dispute over who had technical responsibility over the scene; however, that an SOP calls for GIS or the Night Commander to oversee an investigation does not alter the fact that neither was present at the scene of the Georgia Tech incident, leaving Plaintiff as the highest "ranking" APD officer there. (*See* Pl. Dep. Ex. 22 at CITY 2524.)

interview, which he admitted was "dropp[ing] the ball."[13]  (Pl. Dep. 195-96; *id.* Ex. 22 at CITY 2524; DSUMF ¶¶ 209-10.)

The next day, on January 23, 2019, Defendant Schierbaum met with Plaintiff about the Georgia Tech incident.   (DSUMF ¶ 215.)   According to Plaintiff, Defendant Schierbaum said that GIS did him (Plaintiff) a "disservice" by not responding to the complaint, and that he wanted Plaintiff to "succeed" and to have a "positive, upward, forward trajectory."[14]  (Pl. Dep. 2-5.)  That said, Defendant Schierbaum also changed Plaintiff's shift from the Morning Watch shift to the Evening Watch to provide more supervision; he testified that he wanted Plaintiff to work in a different environment until the open OPS investigations were completed. (Decl. of Corey Moore [Doc. 66-5 ("Pl. Decl.")] ¶¶ 3-5; Schierbaum Dep. 77-81; PSAF ¶ 48.)  When he spoke with Plaintiff—that is, the day after the incident— Defendant Schierbaum did not have access to any investigative files about it, and instead simply wanted Plaintiff to "perform his functions in a different watch." (Schierbaum Dep. 79-81.)  At the time, Schierbaum did not realize that GIS had

---

[13] Chief Shields also testified that separate interviews were likely required by APD policy, but she could not identify the exact policy in question during her deposition.  (Shields Dep. 62.)

[14] Defendant Schierbaum testified that it was "possible I would say that. That would be something I would say."  (Schierbaum Dep. 80-81.)

been engaged with another matter, and thought they refused to respond, doing Plaintiff a "disservice"; however, it later became clear to Schierbaum that that belief was "premature." (*Id.* 79.)

Deputy Chief Glazier and Chief Shields both testified Plaintiff's failures at the crime scene were "extremely basic" and "Policing 101," and Deputy Chief Glazier explained that what he saw as Plaintiff's only excuse—"Nobody told me to do it"—was insufficient. (Glazier Dep. 88-89; Shields Dep. 49, 55-56.) Chief Shields testified that "when you become a supervisor . . . the expectations are that you can engage in sound decision-making, and that was clearly absent in this incident."[15] (Shields Dep. 47; *see also* Glazier Dep. 65.)

---

[15] Plaintiff objects to consideration of this testimony as "argumentative" and a "legal conclusion," but does not explain how or why, or offer contradictory evidence. (*See* R-DSUMF ¶¶ 212, 213, 214.) At most, Plaintiff complains that he was only briefly trained on fingerprinting years ago (*see* Pl. Dep. 35-37), but he never points to any evidence suggesting that fingerprinting and interviewing witness are not basic police skills that he should have been familiar with. Indeed, it is undisputed that Plaintiff received training on fingerprinting and processing vehicles. (DSUMF ¶ 4.) Regardless, the officers' opinions on police practices are supported by their testimony, and do not appear to implicate any particular legal conclusion that the Court is aware of (much less that Plaintiff has identified). And because their view on Plaintiff's conduct are germane to the reasons for any disciplinary actions taken against him, the Court will consider their testimony.

28

Soon after, in February 2019, Deputy Chief Glazier reassigned Plaintiff to the Video Integration Center ("VIC").  (DSUMF ¶ 219; R-DSUMF ¶ 219; PSAF ¶ 51.)  At his deposition, Deputy Chief Glazier explained that Plaintiff "had to be pulled off the street simply for liability reasons because he was involved in significant incidents, and they were not being handled correctly."  (Glazier Dep. 71.)

Defendant Schierbaum testified that he advised Chief Shields the morning after the kidnapping—this is, January 23, 2019—that "we would be initiating an investigation" into the handling of the investigation.  (Glazier Dep. 91.)  He stated that he then informed someone in his chain-of-command—he believed a Captain but admitted it could have been Lieutenant Brauninger—to initiate an OPS complaint.  (*Id.* 91-92.)  Even so, a "Preliminary Complaint Form" opening "an investigation into the allegation that Sergeant Corey Moore failed to act appropriately after he was advised of an armed robbery/kidnapping on 1/21/2019" was not filed until roughly a month later, on February 25, 2019, at 10:55 a.m. (PSAF ¶ 56; Schierbaum Dep., Ex. 9 at CITY 2533.)  Lieutenant Brauninger, meanwhile, sent a memorandum regarding the incident to OPS on February 28, 2019.  (Brauninger Dep. 17, 21-22, Ex. 9 at CITY 2551.)  OPS then opened its

investigation into the complaint (the "2019 Complaint"), and OPS Investigator William Lyons (a white man) was assigned to conduct the factfinding investigation. (DSUMF ¶¶ 222-23, 225; R-DSUMF ¶ 222; Shields Dep. 162.)

OPS Investigator Lyons interviewed Plaintiff as part of his investigation. (DSUMF ¶¶ 225-26.)  During an interview, Plaintiff admitted to Lyons that he "knew the vehicle involved in the crime was parked in the parking lot at the Georgia Tech police station, but [admitted] that the students were allowed to leave in the vehicle after they submitted written statements."  (DSUMF ¶ 227; R-DSUMF ¶ 227.)  OPS Investigator Lyons provided an Investigative Summary for the 2019 OPS Complaint to OPS Lieutenant Zenelaj, who reviewed the fact-finding and determined that Plaintiff violated APD work rules 4.2.3, related to responsibilities of supervisors and 4.2.37, related to unsatisfactory performance.  (DSUMF ¶ 229.) Lieutenant Zenelaj then drafted up his findings for OPS Major Tyus indicating as much, and Major Tyus approved OPS Lieutenant Zenelaj's determination. (DSUMF ¶¶ 231-232.)[16]

---

[16] OPS Lieutenant Zenelaj also sustained violations of APD work rules for Officers Dejonge and Burleigh.  (DSUMF ¶ 230.)

### 6.    Plaintiff's Internal Discrimination Complaint

On February 23, 2019, just before Defendant Schierbaum initiated, or had someone initiate, the 2019 OPS Complaint into the Georgia Tech incident, Plaintiff sent an email to several individuals in his chain-of-command, including Defendant Schierbaum and Deputy Chief Glazier, in which he raised concerns about transfers and/or investigations that Plaintiff believed were "predicated on discrimination." (DSUMF ¶ 296; PSAF ¶ 52.)  Specifically, within the email, Plaintiff wrote, "These transfers and bias investigations predicated on discrimination and circumvented policies makes me question the department's ethics."  (Pl. Dep. Ex. 26.)

Two days later, on February 25, 2019, Deputy Chief Glazier emailed Plaintiff at 1:21 a.m., to indicate that the second transfer, to the VIC, was done at his direction.  (PSAF ¶ 54.)  Deputy Chief Glazier forwarded his and Plaintiff's emails to Major Tyus, the commander of OPS, writing "Fyi."  (PSAF ¶ 55.)

Then, on March 14, 2019, Plaintiff sent an email to Chief Shields, in which he requested to "speak with [Chief Shields] in regards to the discrimination [he] suffered by several members of [the] command staff." [17]   (DSUMF ¶ 297.)

---

[17] Complaints of racial, sexual, and religious discrimination are a "Priority I" complaint, according to APD's "Disciplinary Process" SOP, and are normally investigated, but under the SOP, "discretion may be used in the application of these

According to Plaintiff's email, the problem "ha[d] been festering for some time, but now it is getting worse." (PSAF ¶ 58; R-PSAF ¶ 58; *see also* Shields Dep. Ex. 28.) Deputy Chief Glazier and Defendant Schierbaum were copied on this email. (PSAF ¶ 59.) Despite responding that she would try to meet with him the following week (Shields Dep. Ex. 28), Chief Shields did not meet with Plaintiff; according to her testimony, she was concerned that Plaintiff might be attempting to influence the outcome of the OPS investigation, and she "felt it best to stand back and let the [OPS] process play itself out." (Shield Dep. 77-78.) The Court is not aware of evidence suggesting that she ever informed Plaintiff of this fact, however.

On April 24, 2019, Plaintiff went directly to OPS and filed a formal complaint of race discrimination against Defendant Schierbaum. (PSAF ¶ 63.) Plaintiff signed into OPS at 1:00 p.m., and Sergeant Zachary Kramer (a white male),[18] handled the intake of Plaintiff's complaint. (PSAF ¶¶ 64-65; Shields Dep. 162-63.) In the OPS preliminary complaint form, Sergeant Kramer wrote:

---

criteria where the situation is not urgent, or the evidence lacks credibility." (PSAF ¶¶ 73, 75; Kramer Dep. Ex. 27 at § 5.26.)

[18] Sergeant Kramer used to work in Zone 5, reported directly to Defendant Schierbaum (PSAF ¶ 65), and worked with Plaintiff, with whom he had a "great relationship" and "got along quite well" (Dep. of Zachary Kramer [Doc. 72] 23-28).

> Sgt. Moore names eight co-workers, and recites their possible violations of SOP vis-à-vis their perceived actions (or alleged lack thereof), specifying how these other employees did not face discipline, when he [Sgt. Moore] did face administrative action. It should be noted that Sgt. Moore is Black/African-American, and the other employees named by him are not.
>
> …
>
> Sgt. Moore assert that the fact that the others were not disciplined, or were not deemed to be in-need of a formal investigation, is evidence alone of racial discrimination . . . on the part of Major Schierbaum.

(PSAF ¶ 66; Kramer Dep. Ex. 2 at CITY 3405-07.)  Within his complaint, Plaintiff also identified white colleagues in Zone 5 whom he perceived were involved in supervisory incidents but not investigated or disciplined, including one that led to the City paying a $19,000 to settle a legal dispute relating to improperly closing gay bars.  (Tyus Dep. 29; Shields Dep. 86.)  Plaintiff ended the complaint by writing that there was "a discerning [sic] pattern of Major Schierbaum's racial discrimination, harassment, and abuse of authority," which required investigation.  (PSAF ¶ 68; R-PSAF ¶ 68.)

Approximately four hours after Plaintiff made his formal complaint of race discrimination at OPS, Sergeant Kramer called Defendant Schierbaum and spoke with him for six minutes.  (PSAF ¶ 69; R-PSAF ¶ 69.)  Kramer admitted that, "given the context of the call, there is a possibility that there may have been a

mention of the complaint."  (PSAF ¶ 70.)  Otherwise, the parties cannot account for the topics discussed.  Chief Shields testified that communications about such complaints should not be made "off the record," as Kramer's call appeared to do. (Shields Dep. 91-92.)

On April 29, 2019,[19] Sergeant Kramer determined an OPS investigation into Plaintiff's complaint was not warranted.  (PSAF ¶ 72; R-PSAF ¶ 72; Kramer Dep. 13, 22-23, Ex. 2.)   Sergeant Kramer testified that he reviewed every incident mentioned by Plaintiff, but that he did not believe Plaintiff supplied the credibility required to open a formal investigation.  (Kramer Dep. 23-30.)  According to OPS Major Tyus, "when you read through it, these were generalities.  There was nothing specific.  And again . . . these were not complaints that [Defendant] Schierbaum had a hand in."  (Tyus Dep. 29-30.)  Plaintiff's complaint of racial discrimination was therefore classified as "Received Not Opened," or "RNO."  (PSAF ¶ 77.) RNOs were described in a 2019 OPS Annual Report as "cases . . . handled by the OPS staff where the allegations were either not against an Atlanta Police Department member or there was physical evidence that immediately contradicted

_____

[19] This is the same date Defendant Schierbaum was asked to review the 2019 OPS Complaint file and provide a disciplinary record for it.  (Schierbaum Dep., Ex. 9, at CITY 2515.)

the initial allegation."  (PSAF ¶ 78; *see also* Kramer Dep. Ex. 3.)[20]  Sergeant Kramer explained that the report was poorly worded and that physical evidence was not the only basis on which preliminary investigations would result in an RNO designation.  (Kramer Dep. 52-53.)

OPS Major Tyus sent a letter closing out Plaintiff's complaint on April 29, 2019.  (PSAF ¶ 81.)  While Major Tyus did not conduct his own investigation,  he testified that he had a conversation with Sergeant Kramer (and likely Lieutenant Zenelaj) regarding Plaintiff's complaint; that they discussed the files Plaintiff referenced in it; and that he determined that Defendant Schierbaum "didn't have any part in the disciplinary authority" with respect to three of the referenced incidents, which were "handled at a level far below Major Schierbaum,"[21] and that the Lieutenant involved in improperly closing gay bars was in fact reprimanded and transferred out of Zone 5 as a result of his conduct.   (PSAF ¶ 82; Tyus Dep.

---

[20] Plaintiff notes that, overall, the majority of RNOs came in response to citizens' complaints, as opposed to police complaints, but provides no insight into the overall number of complaints by citizens or police, why investigators designated any of them as RNO, or any other reason why the relative numbers are meaningful.  (*See* PSAF ¶¶ 79-80; *see also* R-PSAF ¶¶79-80.)

[21] Major Tyus explained that Defendant Schierbaum was "not even aware of every" counseling or disciplinary incidents, as they are "issued . . . on a daily basis and you're not going to inundate the major making them aware of every time a sergeant issues a counseling form."  (Tyus Dep. 28.)

23-26.)  Major Tyus then spoke with Deputy Chief Glazier and Chief Shields; Tyus did not identify when he spoke with Glazier, but Shields believed she would have been notified within a couple days.  (Tyus Dep. 20-21; Shields Dep. 93.)

At her deposition, Shields acknowledged that "where there is discrimination, that something more in depth would certainly be warranted," in terms of investigating, even if it were simply "to show that there [] was not racially motivating factors" and avoid litigation such as the present lawsuit.  (PSAF ¶ 95; Shields Dep. 94-95.)  Shields additionally testified, "I also question – as diverse as our department was and you file a complaint and complaint against eight white employees, then I'm wondering where the issue really lies."  (PSAF ¶ 147.)

### 7.    Plaintiff's Demotion in 2019

On April 29, 2019, Defendant Schierbaum was asked to "review the investigative file [for the Georgia Tech incident] and forward your disciplinary recommendation . . . ."[22]  (Schierbaum Dep. Ex. 9 at CITY 2515.)  As discussed,

---

[22] The Disciplinary Process SOP recommends that the immediate supervisor complete the employee discipline worksheet "in most cases."  (PSAF ¶ 97.)  In this "unusual" case, however, Defendant Schierbaum had received multiple OPS packages for Plaintiff in a short period of time and had concerns regarding Plaintiff continuing as a sergeant; as a result, he handled it after he conferred with Plaintiff's supervisors, Captain Prenzinna Spann and Deputy Chief Glazier.  (Schierbaum Dep. 113-15.)

Plaintiff had just filed an OPS complaint alleging race discrimination by Defendant Schierbaum a few days earlier, on April 24, 2019.  (PSAF ¶ 63.)  Schierbaum admitted that he was advised of Plaintiff's OPS complaint of racial discrimination by Major Tyus,[23] "prior to the time I submitted my recommendations."  (PSAF ¶¶ 92-93.)  Chief Shields later testified that she thought "it would've been appropriate to have recused himself from reviewing the [2019 OPS Complaint] file."  (Shields Dep. 98-99.)

On May 14, 2019, roughly 20 days after Plaintiff had lodged his own OPS complaint against Defendant Schierbaum for race discrimination, Defendant Schierbaum recommended demoting Plaintiff in relation to the 2019 OPS Complaint.[24]  (Pl. Dep., Ex. 22 at CITY 2637 (Employee Discipline Worksheet recommending demotion, signed by Defendant Schierbaum and Deputy Chief Glazier).)  Defendant Schierbaum also recommended modifying the investigative disposition for Officers Dejonge and Burleigh from "Sustained" to "Exonerated" because "[Plaintiff] assumed the responsibility to ensure proper crime scene management as well as ensuring Officer Dejonge and Officer Burleigh carried out

---

[23] Separate from any conversation he had with Sergeant Kramer.

[24] Discipline for the August and September 2018 OPS Complaints was recommended on this same day.  (PSAF ¶ 15.)

all investigative functions directed by the department" and there was "no indication within [the OPS investigation] file that any directive was ignored." (DSUMF ¶ 234.)

Prior to recommending demotion, Schierbaum testified that he met "with Deputy Chief Glazier to review my concerns . . . ." (PSAF ¶ 101.) Deputy Chief Glazier had reviewed the OPS investigation, and concurred with both the demotion recommendation and also with Defendant Schierbaum's recommendation to modify the investigative disposition for Officers Dejonge and Burleigh. (DSUMF ¶ 235.) Deputy Chief Glazier testified that, "looking at the totality of the incidents . . . [Plaintiff] had either four or five separate incidents where we felt, or that I felt and the Major clearly felt, that he made poor decisions," and explained that he did not believe Plaintiff took responsibility for his errors or that Plaintiff's performance would improve in his current role. (Glazier Dep. 113.) According to Glazier, the mistakes were:

> just basic policing 101, simple, common-sense measures. Since those weren't performed, then I didn't have any confidence that there would be improvement. . . . [I]n addition to that, the fact that in every single one of those incidents, I never saw [Plaintiff] take any responsibility for any mistakes. In fact, I think in every single incident, he blamed somebody else for not doing the right thing.

(*Id.* 123.)[25]

Assistant Chief Coyt also reviewed the OPS investigation related to 2019 Complaint and concurred with the demotion recommendation.  (DSUMF ¶ 242.) He would later testify that he believed that Plaintiff "was not suited to be a supervisor," and would have been a "risk to the APD" if he were "left in a supervisory position." (Transcript of Mar. 11, 2021 CSB Demotion Hearing [Doc. 62-16] at 78, 80.)  Coyt states further in a declaration that, based upon the number of incidents that occurred in a short time frame and the fact that Plaintiff did not take responsibility for the issues, he (Coyt) did not believe Plaintiff was a good example for other officers to follow; he also stated that he did not believe discipline would have adequately reflected the severity of Plaintiff's problems.  (Coyt Decl. ¶ 7.)

---

[25] Plaintiff repeatedly objects to consideration of his various supervisors' testimony about how they viewed Plaintiff's conduct.  (*See*, *e.g.*, R-DSUMF ¶¶ 239, 244-46, 248.)  His only evidence for disputing their testimony, however, is Lieutenant Brauninger's belief that Plaintiff was a "good sergeant" who was responsive to feedback.  (*Id.* (citing Brauninger Dep. 7-8).)  But the mere fact that Lieutenant Brauninger personally thought Plaintiff to be a good sergeant as a general matter does not, on its own, contradict Plaintiff's other supervisors subjective belief that he was not, given the results of the OPS investigations.  As a result, the Court will consider their testimony over Plaintiff's objection.

Chief Shields was the ultimate disciplinary authority for the demotion (PSAF ¶ 102), and she also reviewed the OPS investigation related to 2019 OPS Complaint and concurred with the recommendation.  (DSUMF ¶ 247; R-DSUMF ¶ 247.)  She testified that she also "had multiple conversations with the commanders who were recommending that he be demoted," including Deputy Chief Glazier, Assistant Chief Bryant,[26] and Deputy Chief Coyt[27]; and that it was her belief that demotion was appropriate because of Plaintiff's repeated, poor decision-making and his unwillingness to take responsibility for mistakes.  (Shields Dep. 15-16, 104, 133, 144, 153.)

An NPAA for demotion was issued to Plaintiff related to 2019 OPS Complaint (DSUMF ¶ 249), and stated that the demotion was for failing to ensure that officers "properly processed and secured the scene" and "secured the proper statements regarding the crime" (PSAF ¶ 107; R-PSAF ¶ 107).  Plaintiff responded, requesting that he not be demoted (DSUMF ¶ 250); however, Plaintiff was demoted

---

[26] Shields testified that she spoke with Bryant months before his retirement in late April 2019.  (PSAF ¶ 105; Shields Dep. 16-17.)

[27] She did not speak with Defendant Schierbaum, who, as a Major, was subordinate to Deputy Chief Glazier.  (Shields Dep. 17.)

to Police Officer effective October 21, 2019.  (DSUMF ¶¶ 251-52.)  While Plaintiff

appealed the demotion to the CSB,[28] it was upheld.  (DSUMF ¶¶ 253-54.)

Despite the demotion, Plaintiff remains employed by the APD as a Police

Officer.  (DSUMF ¶ 78.)

### 8. Plaintiff's Performance Evaluations

Despite the five incidents described above, Plaintiff had glowing reviews

from his immediate supervisors during his time as Sergeant, and it is undisputed

that they interact with their subordinates more and observe their work closely than

individuals higher up the chain-of-command.  (PSAF ¶ 110.)  First, in December

2017—after the incident resulting in the 2017 OPS Complaint—Plaintiff received

a mid-year evaluation in which he was rated 4.41 or "Highly Effective."  (PSAF ¶

8.)  The "Highly Effective" rating is defined as "Exceeds the expected performance

standards on a regular basis."  (PSAF ¶ 19.)

Then, on June 30, 2018, at the conclusion of Plaintiff's probationary year as

a Sergeant, Lieutenant Genson completed a performance evaluation as his

---

[28] The Civil Service Board (CSB) explicitly stated during the hearing for the demotion that it "does not have the authority to rule on or resolve any discrimination claims."  (PSAF ¶ 108.)

immediate supervisor.[29]  (DSUMF ¶ 308.)  At the time, Lieutenant Genson had only supervised Plaintiff for approximately one month.  (DSUMF ¶ 309.)  In any event, Lieutenant Genson rated Plaintiff 4.56, or "Highly Effective," and no negative comments were included in the "Rater Overall Comments" and "Developmental Recommendations" sections of the form.  (PSAF ¶¶ 11, 13.)  Lieutenant Genson testified that he "thought [Plaintiff] was extremely effective," was a good supervisor, was receptive to feedback, and sought guidance when necessary.  (PSAF ¶ 112.)  Lieutenant Genson did not see any "red flag[s]" with Plaintiff.  (PSAF ¶ 114; R-PSAF ¶ 114.)  And while Genson testified at his deposition that he could not recall much about the shooting incident leading to the May 2018 OPS complaint, at the CSB demotion hearing, Genson stated that it "concern[ed]" him that while Plaintiff was in charge of the scene, "no attempts were made by officers to see if there were additional witnesses or people injured," which were "basic tasks," and particularly so in this instance because one of the bullets went into a neighboring apartment.  (Genson Dep. 16-18; CSB Hearing Transcript [Doc. 81-15] 129-30, 161-63.)

---

[29] Immediate supervisors interact with their subordinates more than individuals high up the chain-of-command and would have the opportunity to observe their subordinates work closely.  (PSAF ¶ 110.)

On December 31, 2018, shortly before the kidnapping incident at Georgia Tech, Lieutenant Brauninger completed a performance evaluation for Plaintiff. (DSUMF ¶ 310; PSAF ¶¶ 17, 19.)  When Lieutenant Brauninger completed it, he had only supervised Plaintiff for approximately two months, and thus, did not supervise him when any of the other, aforementioned incidents took place.  (R-DSUMF ¶ 311; Brauninger Dep. 7-10, Ex 6; Pl. Dep. Exs. 14-16, 18.)  Even so, Lieutenant Brauninger testified that no one in his chain-of-command had raised any concerns to him about Plaintiff's performance or his ability to supervise other officers at the time Brauninger became his supervisor, including Defendant Schierbaum and Deputy Chief Glazier.  (PSAF ¶ 30; R-PSAF ¶ 30; PSAF ¶ 119; R-PSAF ¶ 119.)  Regardless, he rated Plaintiff at 4.25, still in the "Highly Effective" range (PSAF ¶ 18), and testified that overall, Plaintiff "was a good sergeant for me," was receptive to his feedback, contacted him with questions, and was "effective" at handling incidents (PSAF ¶¶ 117-18).  The review was signed by Captain Villaroel on March 1, 2019, after the Georgia Tech incident and Plaintiff's transfer to the VIC, but before his OPS complaint, suspension, or demotion.  (PSAF ¶ 21; R-PSAF ¶ 21.)

Lieutenant Brauninger testified that following the kidnapping incident, he believed that "command felt like it needed – they wanted a formal investigation into the incident"; and by command, he meant Defendant Schierbaum and Chief Shields.  (PSAF ¶ 121.)  Until that incident, no one had discussed wanting to demote Plaintiff with Lieutenant Brauninger, and afterward, he spoke up on behalf of Plaintiff.  (PSAF ¶¶ 123-24.)  Neither Lieutenant Brauninger nor Lieutenant Genson could recall being contacted about the demotion decision and were surprised to learn that Plaintiff was demoted.[30]  (Brauninger Dep. 41; Genson Dep. 24; PSAF ¶ 127.)

Although Lieutenants Genson and Brauninger considered Plaintiff to be a good sergeant, who was responsive to requests and feedback, Chief Shields, Assistant Chief Coyt, and Deputy Chief Glazier testified to their belief that Plaintiff was not receptive to suggestions or constructive criticism and failed to take

---

[30] According to Chief Shields, APD's performance evaluation forms were not "looked at closely" and "never accurately reflected the work people were doing." (Shields Dep. 111-12, 125-26.)  She testified that most APD employees who are fired have nevertheless had performance evaluations describing them as "all-star[s]."  (*Id.* at 120-21.)

responsibility for his misconduct.[31]   (Genson Dep. 9-10; Brauninger Dep. 7-8; Shields Dep. 104, 114, 144, 153; Glazier Dep. 123; Coyt Decl. ¶ 9.)

And while, as a general matter, supervisors are encouraged to use counseling for minor incidents instead of formal complaints, and training as a tool before resorting to discipline (PSAF ¶¶ 163-64),[32] Chief Shields testified that she did not put Plaintiff on a performance improvement plan because she did not believe he would be willing to accept feedback on his performance issues.  (Shields Dep. 126, 129.)  Deputy Chief Glazier also did not believe providing Plaintiff with additional training would be helpful because Plaintiff did not understand the "basic level" of policing, like the need to exam a crime scene or how to start processing a one. (Glazier Dep. 132-33.)  He testified similarly with regard to pairing Plaintiff with a mentor—Deputy Chief Glazier thought Plaintiff's "lack of understanding of the basics of policing, investigation, and supervision" would have prevented him from improving as a sergeant, even with mentorship.  (*Id*. 144-45.)  Ultimately, Defendants neither recommended Plaintiff receive remedial training; initiated the

---

[31] Neither Schierbaum, Glazier, nor Shields reviewed Plaintiff's performance evaluations before recommending and implementing discipline. (PSAF ¶¶ 183-85.)

[32] APD offers remediation and training for Sergeants, including on crime scene investigation.  (PSAF ¶¶ 164-65)

Early Intervention program[33]; nor put Plaintiff on a performance improvement plan before suspending and demoting him.  (PSAF ¶¶ 178-81.)

### 9.      Plaintiff's Charge of Discrimination

On July 2, 2019, Plaintiff filed an EEOC charge, which alleged "unfair treatment," discrimination based on race, as well as retaliation (DSUMF ¶ 265), and on August 20, 2019, Plaintiff amended his charge to assert discrimination based on race and color, including disparate treatment, hostile work environment discrimination, and retaliation (DSUMF ¶ 266).[34]

### 10.     Plaintiff's Allegations of Discrimination and Retaliation

Plaintiff believes all the disciplinary actions he was subjected to had discriminatory and retaliatory motives.   (DSUMF ¶ 272; R-DSUMF ¶ 272.) Plaintiff alleges that "OPS investigations are tailored to certain outcomes" and that

---

[33] The Early Intervention Program exists to correct a "discernible pattern of repeated complaints or allegations against an employee" or "behavior displayed by an employee which is so unusual or inappropriate, it creates an unsafe or disruptive work environment," and was used by Defendant Schierbaum before, in April 2018. (PSAF ¶¶ 169-170.)

[34] While Plaintiff's amended charge raised allegations of sexual harassment against Defendant Schierbaum—for instance, Plaintiff complained that Schierbaum complimented Plaintiff's appearance at a Mayoral Inaugural Dinner and his smile—Plaintiff later admitted during his deposition that he "wasn't offended by the comments." (Glazier Dep. Ex. 37 (amended charge); Pl. Dep. 232.)

OPS "look[s] for a reason to sustain" a work rule violation, but he did not know if the OPS officers' "motives are discriminatory."[35]  (DSUMF ¶ 274.)   Plaintiff believes Lieutenant Zenelaj was "influenced by [Defendant] Schierbaum" with respect to the five OPS investigations.   (DSUMF ¶ 277.)   Plaintiff alleges Defendant Schierbaum "steered" culpability towards him, but Plaintiff does not "know what [Defendant Schierbaum] specifically did" to make it happen. (DSUMF ¶ 280.)  And in any event, Plaintiff could not provide any examples of OPS investigations resulting in sustained work rule violations because of race, but reiterated his belief that "packages can have discriminatory means of going to OPS." (DSUMF ¶ 275; R-DSUMF ¶ 275; Pl. Dep. 84-86.)

While he did not initially think the discipline related to the 2017 OPS Complaint—the first of the five OPS complaints—was discriminatory when it was administered in January 2019, Plaintiff now attributes it to discrimination because "the totality of the circumstances; when you look at each incident, my career has been absolutely destroyed, and I believe it was discrimination and retaliatory

---

[35] Plaintiff testified to his belief that Defendant Schierbaum discriminated and retaliated against him, but also testified that he did not "know what anyone else's motives are"—that is, if their "motives are . . . discriminatory or retaliatory" or if they "just . . . don't like" him.  (Pl. Dep. 82-83.)

motives behind it." (Pl. Dep. 81.)  He also claimed it was discriminatory because he received discipline despite not initially being accused of any rule violations. (*Id.*)  He believes that Defendant Schierbaum, and possibly Chief Shields and Deputy Chief Glazier, may have had some improper "influence[,]" if only because the "things that happened to me just hadn't happened to anyone else before." (*Id.* 81-83.)  Plaintiff believes "white shirts rarely will go against each other" and "stick together." (DSUMF ¶ 283.)

OPS Lieutenant Zenelaj could not recall receiving any directives related to Plaintiff's demotion in response to the 2019 OPS Complaint before the investigation had been completed, and likewise, OPS Major Tyus testified that he also did not recall any conversations with anyone in Plaintiff's chain-of-command before the investigation was complete.  (DSUMF ¶¶ 277-78.)[36]  Defendant Schierbaum did not recall discussing Plaintiff's concerns about superiors with Chief Shields.  (Schierbaum Dep. 94-95.)

---

[36] Plaintiff disputes this fact by noting that OPS Major Tyus testified that he spoke with Chief Shields, Deputy Chief Glazier, and Defendant Schierbaum about Plaintiff's complaint of discrimination after the OPS investigation was closed out. (R-DSUMF ¶ 278 (citing Tyus Dep. 20; Schierbaum Dep. 105).)  But because Plaintiff's cited evidence does not contradict the asserted fact—that Tyus did not recall speaking with them during the investigation—Plaintiff's objection is overruled.

Plaintiff believes his transfers—that is, as his transfer to the Evening Watch Shift and then to the VIC—were "done in a discriminatory manner [because] other white colleagues were not transferred for incidents they were involved in around the same time period."   (R-DSUMF ¶ 295.)   Plaintiff believes being moved from the Morning Watch shift to the Evening Watch shift was punishment because he "didn't want to be transferred."   (DSUMF ¶ 298; R-DSUMF ¶ 298.)   Plaintiff likewise believes his assignment to the VIC was punishment because he "loved where [he] was" and "nobody said what the end result was."   (DSUMF ¶ 302.) Neither his position nor his pay from the City were changed with the moves, but he was "unable to work certain extra jobs" and had to change his personal schedule and home life to account for his new work schedule, which was not "convenient." (Pl. Dep. 237-38; DSUMF ¶¶ 300-01, 303; R-DSUMF ¶¶ 300, 303.)

### 11.   Comparator Evidence

Plaintiff was the first non-probationary Sergeant demoted since at least January 1, 2005, if not 1995 (PSAF ¶¶ 130-32), though Chief Shields testified that "demotions were not common," and that APD was "more inclined to fire people than [they] are to demote them" (Shields Dep. 15).

Along these lines, Chief Shields terminated three sergeants during her tenure as a result of OPS investigations.   (PSAF ¶ 136; R-PSAF ¶ 136; Adverse Actions

Form signed by Shields [Doc. 66-12].)  Records reflect that Sgt. Lonnie Hood was terminated because on "May 30, 2020, [he] used unnecessary force"; that Sgt. James Hines was terminated because on "May 1, 2019, while on duty, [he] used unnecessary force when you punched [an individual] in the face while she was handcuffed;" and that Sgt. Mathieu Cadeau was terminated because on "February 27, 2017," while "working an approved extra-job for a motocross event at the Georgia Dome," he fired a round from his gun "[a]fter a verbal dispute." (Adverse Actions Form signed by Shields.)  Based upon this, Plaintiff highlights that the only officers terminated for responsibilities of a supervisor or unsatisfactory performance were terminated before Chief Shields became Chief in December 2016.  (PSAF ¶ 140.)

According to APD records produced by Defendants, from January 1, 1999 to October 14, 2019 (just before Plaintiff's demotion and suspension), only one employee was dismissed for a sustained "Responsibilities of Supervisor" work rule violation, with 29 oral admonishments, 24 written reprimands, and 30 suspensions, all with an average of four days suspended (compared to the maximum suspension of 15 days suspension for a Category C violation and demotion issued by Defendant Schierbaum).  (PSAF ¶ 141.)  During that period, no action was taken on five

50

occasions for violations relating to responsibilities of a supervisor, but no one had been demoted for such violations.  (PSAF ¶¶ 142-43.)

For unsatisfactory performance violations from January 1, 1999 to October 14, 2019, eight employees were dismissed (none under Chief Shields), with nine oral admonishments, 67 written reprimands, and 50 suspensions, with an average of only four days suspended (again compared to Plaintiff's 15-day suspension and demotion).  (PSAF ¶ 144.)  No action was taken on 11 occasions for unsatisfactory performance during that time frame, but no one had been demoted for such violations.  (PSAF ¶¶ 145-46.)

## II.    PROCEDURAL HISTORY

On August 14, 2020, Plaintiff filed the present action.  [Doc. 1.]  In his complaint, Plaintiff claimed that his treatment, culminating in his suspension and demotion, amounted to race discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981, as well as discrimination in violation of the EPC, brought via 42 U.S.C. § 1983.  [Doc. 14 ¶¶ 52-86.]  Plaintiff brings his Title VII claims against the City; the remaining Section 1981 and EPC claims are asserted against both the City and Defendant Schierbaum.  [*Compare*, Doc. 1, Counts I, III, *with id.*, Counts II, IV.] On August 15, 2022, Defendants filed their motion for summary

judgment.  [Doc. 62.]  Plaintiff has responded in opposition to the motion [Doc. 67], and Defendants have filed a reply [Doc. 81].  The motion is now ripe for resolution.

## III.   DISCUSSION

In their motion, Defendants seek summary judgment on each of Plaintiff's claims.  [Doc. 62.]  To start, Defendants argue that there are multiple reasons that Plaintiff's race discrimination claims fail.  [Doc. 62-1.]  They first contend that Plaintiff has not identified any similarly situated employee outside of Plaintiff's protected class who was treated more favorably, and thus, he cannot establish a prima facie case of discrimination.   [*Id.* at 6-9.]  Next, they argue that even considering the myriad pieces of circumstantial evidence Plaintiff has produced outside of the *McDonnell Douglas* framework, he has still not set forth a convincing mosaic of circumstantial evidence.  [*Id.* at 9-11.]  Finally, they argue that even if Plaintiff could establish a prima facie case of discrimination, Defendants had legitimate, nondiscriminatory reasons for their actions, and Plaintiff cannot establish that they were actually pretext for unlawful discrimination.  [*Id.* at 11-23.]

Defendants also set out multiple arguments for summary judgment on Plaintiff's retaliation claims.   They argue that some of Plaintiff's general

52

complaints about discrimination do not amount to protected activity [Doc. 62 at 23-25], but that regardless, Plaintiff's evidence fails to establish the causal element of the prima facie case, and, that even if it did, there were legitimate, nonretaliatory reasons for the employment decisions in question, namely Plaintiff's conduct during the five incidents resulting in sustained OPS complaints against him [*id.* at 24-29].

Finally, in their last argument for summary judgment, Defendants contend that Plaintiff's evidence fails to establish municipal liability under 42 U.S.C. § 1983,[37] as he has not demonstrated that any adverse employment action was taken against him as part of a governmental policy or custom.  [Doc. 62-1 at 29-34.]

In his response, Plaintiff argues that genuine issues of material fact preclude summary judgment on his retaliation claims.  [Doc. 67.]  Plaintiff does not attempt to save his discrimination claims, except insofar as they are necessary to establish that he engaged in protected activity for purposes of his retaliation claims.  [*Id.*] As to his retaliation claim, however, he first argues that he actually engaged in protected activity in February and March 2019, when he emailed his command; and not merely when he filed his formal OPS complaint on April 24, 2019 and later

---

[37] *See generally Monell v. Dep't of Soc., Servs.*, 426 U.S. 658 (1978).

filed EEOC charges, as Defendants suggest.  [*Id.* at 14-18.]  He also contends that the temporal proximity between his various complaints, on the one hand, and the OPS investigation into the kidnapping incident at Georgia Tech and his demotion, on the other, when combined with other circumstantial evidence, is sufficient to establish not only the causation element of a prima facie case of retaliation, but also to create a triable issue on pretext.  [*Id.* at 17-32.]

Plaintiff next argues that, regardless of the foregoing, he has also set forth sufficient circumstantial evidence of retaliation to create a "convincing mosaic" that would allow him to bypass the *McDonnell Douglas* burden-shifting framework and survive summary judgment.  [Doc. 67 at 32-33.]

Lastly, Plaintiff contends that his Section 1983 retaliation claim should survive against both Defendants; in particular, because Defendant Schierbaum purportedly "oversaw the demotion of Moore through use of a cat's paw by tainting Deputy Chief Glazier's perception of Moore, who then tainted and guided Chief Shields' decision to demote Moore."  [Doc. 67 at 34-35.]

## A.    The Summary Judgment Standard

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is entitled to summary judgment.  *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark*, 929 F.2d at 608.  The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like,

designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## B.   Abandoned Claims

In his complaint, Plaintiff raises claims for discrimination under Title VII, Sections 1981 and 1983, and the EPC.[38]   [*See* Doc. 1, Counts I, II.]   Despite asserting them, in response to Defendants' motion for summary judgment, which argues that summary judgment should be granted on all of his discrimination claims, Plaintiff has lodged no opposition or otherwise suggested that summary

---

[38] As noted, Plaintiff also raised claims of sexual harassment based upon Defendant Schierbaum's conduct in his EEOC charge, but never asserted them in the litigation before this Court.

judgment would not be appropriate.  [*See* Doc. 67.]  Plaintiff also fails to respond to Defendants' arguments that, for purposes of his retaliation claims, the only adverse employment actions he suffered were his suspension and demotion in 2019, and that he (Plaintiff) has not set forth any evidence warranting the imposition of punitive damages against Defendant Schierbaum.  [*Id.*]

As a result, summary judgment should in fact be granted as to any claim Plaintiff has asserted for discrimination, or might have asserted, pursuant to Title VII, Section 1981, or the EPC, as well as his retaliation claims to the extent they are not premised upon his suspension or demotion, or seek punitive damages from Defendant Schierbaum.  *See, e.g., Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)); *see also Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) ("Because those issues are not briefed, they are deemed abandoned."); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (holding that failure to brief and argue an issue at the district court is sufficient to find the issue

has been abandoned).  Thus, the only substantive claims at issue in this case are

Plaintiff's claims for retaliation under Title VII and Sections 1981 and 1983,[39]

which the Court now addresses.

**C.    Retaliation**

In addition to prohibiting discrimination on the basis of enumerated

protected characteristics such as race, Title VII also prohibits retaliation against an

employee "because he has opposed any practice made an unlawful [by Title VII],

or because he has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-

3(a).  "Section 1981 also encompasses retaliation claims, and the elements required

to establish retaliation claims under § 1981 are the same as those required for

---

[39] Plaintiff has not asserted a claim of retaliation pursuant to the EPC, nor could he.  *See Watkins v. Bowden*, 105 F.3d 1344, 1354-55 (11th Cir. 1997) (affirming trial court's grant of a directed verdict for defendants on plaintiff's EPC retaliation claim under Section 1983 because "[a] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause") (citations omitted); *see also Owens v. Jackson Cnty. Bd. of Educ.*, 561 F. App'x 846, 848 (11th Cir. 2014) ("Harding contends that the district court erred by denying summary judgment on Owens' Fourteenth Amendment retaliation claim.  This Court has held that a claim of gender-based retaliation 'simply does not implicate the Equal Protection Clause.'); *Ratliff v. DeKalb Cnty.*, 62 F.3d 338, 340-41 (11th Cir. 1995) ("[T]he right to be free from retaliation is clearly established as a first amendment right and as a statutory right under Title VII; but no clearly established right exists under the equal protection clause to be free from retaliation.").

retaliation claims under Title VII." *Word v. AT&T*, 576 F. App'x 908, 912 (11th Cir. 2014) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008) and *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)). Accordingly, the Court will address Plaintiff's retaliation claims altogether.

Additionally, when an employee relies on circumstantial evidence to show retaliation under Title VII, as Plaintiff does here, he must first establish a prima facie case of retaliation by showing that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is some causal connection between the two events. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). After a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to produce legitimate reasons for the adverse employment actions. *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000). If the defendant offers legitimate reasons, the plaintiff must respond by showing that the employer's reasons are actually pretext for unlawful retaliation. *Id.*

### 1.    Prima Facie Case

As mentioned briefly above, Defendants first argue that Plaintiff cannot establish a prima facie case of retaliation because Plaintiff's general, emailed complaints about discrimination do not amount to protected activity and because

59

his evidence fails to establish that his protected activity was causally related to his suspension or demotion.

### a.    Protected Activity

While Plaintiff maintains that he engaged in protected activity when he emailed members of his chain-of-command, including Defendant Schierbaum, on February 23, 2019, to raise concerns about "transfers and bias investigations"; and when he emailed Chief Shields, copying Deputy Chief Glazier and Defendant Schierbaum, on March 14, 2019, to complain about "discrimination [he] suffered by several members of [the] command staff" (Doc. 64 at 16-17; DSUMF ¶¶ 296-97; PSAF ¶ 58]; Defendants contend that Plaintiff only engaged in protected activity when he later "submitted a complaint to OPS in April 2019 and when he filed EEOC charges on July 2, 2019, August 20, 2019, and October 22, 2019" [Doc. 62-1 at 24-25; *see also* Doc. 81 at 3 n.3].

In Title VII, Congress created two types of activities that are protected against retaliation.  *See* 42 U.S.C. § 2000e3(a).  An employer may not retaliate against an employee because, first, "he has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause), or second, "he has made a charge, testified, assisted, or participated in any manner in an

60

investigation, proceeding, or hearing under this subchapter" (the participation clause). *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e3(a)). Because no EEOC charge or investigation had been initiated (nor any lawsuit) under Title VII when Plaintiff he sent his emails complaining generally about discrimination in February and March of 2019, Plaintiff cannot proceed under the participation clause. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) and *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)). The Court therefore considers whether those emails were protected under the opposition clause.

To establish statutorily protected activity under the opposition clause, a plaintiff must show that he had a "good faith, reasonable belief" that his employer had engaged in an unlawful employment practice, and that he in fact opposed that practice. *Ceus v. City of Tampa*, 803 F. App'x 235, 245 (11th Cir. 2020) (citation omitted). In *Crawford v. Metropolitan Government of Nashville and Davidson County*, the Supreme Court considered what constitutes opposition in the context of a Title VII retaliation claim, and explained that "[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning, to resist or antagonize . . . ;

to contend against; to confront; to resist; withstand." *Id.* at 276 (internal citation and quotation marks omitted). Based upon this, "[m]aking informal complaints to superiors about suspected illegal discrimination may qualify as protected expression under the opposition clause of Title VII. Nevertheless, not every informal complaint made by an employee automatically qualifies as a protected expression that shields the employee from subsequent retaliation." *Fields v. Locke Lord Bissell & Liddell LLP*, No. 1:07-CV-2984-TWT, 2009 WL 2341981, at *12 (N.D. Ga. July 28, 2009) (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) and *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989)). Ultimately, a "complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." EEOC Compl. Man. (CCH) §§ 8-II-B(2) (2006); *see also Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (using the EEOC manual in interpreting the opposition clause of the antiretaliation statute); *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (same).[40]

---

[40] In *Crawford*, the Supreme Court also used the EEOC manual to guide its interpretation of the anti-retaliation provisions of Title VII. *See* 555 U.S. at 276.

In a footnote, Plaintiff briefly argues that his February and March 2019 emails "convey[ed] resistance to a perceived potential EEO violation," and were therefore protected under Title VII's opposition clause.  [Doc. 67 at 16-17 n.3 (quoting *Questions and Answers: Enforcement Guidance on Retaliation and Related Issues*, EEOC, No. EEOC-NVTA-2016-5 (August 26, 2016), located at https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues (last visited Dec. 5, 2022)).]  Defendants respond that the emails "are nothing more than generalized complaints about poor treatment," and therefore do not amount to protected activity [Doc. 62-1 at 21 n.13 (citing *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995); *Hayes v. Burger King Corp.*, No. 1:06-CV-1713-JOF-CCH, 2008 WL 11333445, at *3, 7-8 (N.D. Ga April 14, 2008; *Crumpton v. St. Vincent's Hosp.*, 963 F. Supp. 1104, 1119 (N.D. Ala. 1997)).

The entirety of Plaintiff's February 23, 2019 email reads as follows:

As the only probationary Sergeant assigned to Zone 5 within the last two years there has been a real lack of communication and support. During my tenure there has been virtually no contact with my chain-of-command aside from the revolving door of lieutenants. Perhaps that is indicative of being assigned to Morning Watch, but if there were any deficiencies prior to February of 2019 surely they would have been documented through the evaluation process.  My probationary status ended in June 2018 with rave reviews from my

supervisors.  After two transfers in less than 30 days I am confused as to what the ultimate goal is.

The first transfer came in the wake of an incident in which the acting Night Commanders was advised of a call that SOP required him to respond.   The Night Commander is in charge of any significant incident in which he or she is required to respond.  I followed the Night Commander's instructions but within 8 hours after that incident my whole life is uprooted with a transfer.  Major Schierbaum stated "the department dropped the ball, you did not get the support you needed," so it is puzzling why I am the only person who was transferred.  I was told that the transfer was to allow me to handle more significant incidents, but that makes no sense.   While on Morning Watch I handled 78 significant incidents in 20 months.  Why would you want me to handle more incidents if I am deficient?  The proper recourse would be to develop a performance plan and mentor me with a more seasoned Lieutenant if in fact I was deficient.  I am absolutely not deficient and all my peers and supervisors who actually know me will attest to that.  Instead all I got was chastised by Major Schierbaum, which was totally unprofessional and transferred to a watch with a brand new lieutenant.  Granted I was only assigned to Evening Watch for a short time, but it does not appear there would have been much of a variance in the number of significant incidents.

Now this most recent transfer comes after an incident in which my supervisor stated, "man you did a hell of a job!" but again my life is uprooted with a transfer.  My off days have been changed twice in less than 30 days.  No one ever took into account my many obligations at home.   The command staff treats us like commodities but call ourselves APD family.   These bias investigations predicated on discrimination and circumvented policies makes me question the department's ethics.  If someone would please clarify what this most recent transfer is about because the first one obviously lacks merit now.  Captain Villaroel did speak with me and he is the only person who has shown any concern for me personally and professionally, but I would like to meet with my entire chain-of-command including

Chief Shields and Commissioner Turner for a thorough explanation please.

(Glazier Dep. Ex. 26.)  His March 14, 2019 email, meanwhile, states:

I know you are extremely busy, however, this is my second attempt at a Hail Mary.  I really need to speak with you in regards to the discrimination I suffered by several members of your command staff. It has been festering for some time, but now it is getting worse.

(Shields Dep. Ex. 28).

In the undersigned's view, Plaintiff's February and March 2019 emails do not amount to protected activity, as they did not identify any particular employment action alleged to be unlawful discrimination, the specific protected characteristic or any other dimension on which the unidentified discrimination allegedly occurred, or who allegedly engaged in discrimination.  Plaintiff only asks what "the most recent" transfer was based upon, and asserted that the previous one "lacked merit." (Shields Dep. Ex. 2).  Critically, he does not affirmatively state that any particular adverse action was biased or predicated on discrimination, much less explain why it was discriminatory as opposed to simply unmerited.

In a recent case largely on point, *Ceus v. City of Tampa*, the Eleventh Circuit was faced with a series of informal complaints made by a black firefighter about alleged discrimination, and found none of them protected.  803 F. App'x 235 (11th

65

Cir. 2020).  In the firefighter's first complaint, he complained about his ability to advance in the roles, urged that the department "is a racist department," and asserted that he had "encountered all kinds of discrimination on this job." *Id.* at 246.  The Circuit found that even though the email "generally decried racism" within the department, because it failed to tie the accusation either to any specific act of discrimination or to any employee accused of discrimination, it was not protected activity.  *Id.*  Meanwhile, the Circuit found another of the firefighter's complaints, made in relation to an unsatisfactory performance review, to be unprotected, even though he again raised concerns over "allegedly racist statements"; the court reasoned that the statements at issue were not sufficient to establish a discrimination claim on its own and failed to connect the statements to any other adverse employment practice.  *Id.* at 247.  Finally, the Circuit found that a final letter from the firefighter, alleging that he was forced to use paid time off "due to illegal actions by [fire department] supervisors," was not protected because it "does not reveal even a subjective belief of discrimination." *Id.*  In reaching these conclusions, the Circuit observed that complaints alleging discrimination will not be protected unless they "offer proof of discrimination in support of [otherwise] conclusory allegations." *Id.* (citing *Coutu*, 47 F.3d at 1074).

66

The Eleventh Circuit has reached similar conclusions in cases where a purported victim of discrimination fails to identify with some specificity (1) the act that was allegedly discriminatory, (2) the characteristic on which the purported discrimination was based, or at a minimum, (3) enough information to reasonably enable the employer to identify the allegedly discriminatory conduct and how it was discriminatory. *See, e.g., Rodriguez v. Miami Dade Cnty. Pub. Hous. & Cmty. Dev.*, 776 F. App'x 625, 626 (11th Cir. 2019) ("While Rodriguez did report that her supervisor [] harassed her on several occasions, she never specified that the harassment was based on, or involved derogatory comments about, her national origin."); *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (holding that employees cannot rely on employers to "infer that discrimination has occurred" or what the discrimination consisted of); *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1071 (11th Cir. 1995) ("Although Coutu's written grievance contained a conclusory allegation of racial discrimination . . . [at the hearing on it, she and her attorney] made no allegation

and offered no proof of race or national origin discrimination; she contended only that she worked hard and deserved a better rating.").[41]

Considering Plaintiff's February and March 2019 emails in light of these decisions, the Court cannot find that they amount to protected activity. Although Plaintiff clearly takes issue in the February email with his "revolving door" of supervisors and the decision to transfer him, he only invokes "discrimination" generally with respect to "bias investigations,"[42] neglects to support his conclusory statement that any particular investigation was somehow bias with evidence of discriminatory motive or prejudice, does not identify any specific employee

---

[41] While *Rodriguez* and *Coutu* dealt solely with the substance of an aggrieved employee's complaint and whether it was sufficient to identify a particular unlawful employment practice, in many of cases where courts are presented with complaints as conclusory as this, they also analyze whether a plaintiff could even have a "good faith, reasonable belief" that he or she suffered from discrimination in the first place, which is a separate requirement for engaging in protected expression. *See, e.g.*, *Hayes v. Burger King Corp.*, No. 1:06-CV-1713-JOF-CCH, 2008 WL 11333445, at *8 (N.D. Ga. Apr. 14, 2008), *report and recommendation adopted*, 2008 WL 11334164 (N.D. Ga. June 11, 2008); *see also Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997) (recognizing "objectively reasonable" standard as requirement for retaliation claims). Notably, Plaintiff has abandoned all of his discrimination claims in this case. Even so, Defendants have not argued that Plaintiff did not have a good faith, reasonable belief that he suffered from discrimination, and as a result, the Court will not delve into the issue here.

[42] Presumably, investigations that had been ongoing since late 2017.

involved in the allegedly biased investigation(s),[43] and fails to even explain the protected characteristic on which the alleged bias and/or discrimination was predicated.[44]   The March email, asking to discuss "discrimination [Plaintiff] suffered by several members of your command staff," fairs little better, having failed to identify any allegedly discriminatory employment practice (much less complain about any specific practice, discriminatory or otherwise), any member of the command staff who is alleged to have participated in that discriminatory conduct, what protected characteristic the alleged discrimination was based upon, or indeed, any specific information or evidence in support.   Without more, Plaintiff's emails conclusorily asserting that he was subject to discrimination will not amount to protected activity under Title VII or Section 1981.   *See Ceus,* 803 F. App'x at 246-47; *Rodriguez*, 776 F. App'x at 626; *Coutu*, 47 F.3d at 1071.

---

[43] Plaintiff does not identify any investigator at all in the email, or suggest that any particular individual involved in the OPS investigations acted in a discriminatory and biased fashion.  By the undersigned's count, at least ten APD employees were involved in one of the five OPS investigations:  OPS Investigators Battle, Nixon, and Clayton; OPS Lieutenant Zenelaj (white man); OPS Major Tyus (black man); Captain Vasquez; Deputy Chief Glazier (white man); Assistant Chief Bryant (black man); Assistant Chief Coyt (black man); and Chief Shields (white woman).

[44] The last point is particularly salient in a case where, as here, Plaintiff initially alleged in his EEOC charge that Defendant Schierbaum discriminated against him not only on the basis of race, but also on the basis of sex.

Despite the foregoing, the parties agree that Plaintiff engaged in protected activity when he submitted his formal complaint to OPS on April 24 2019, and when he filed or amended his EEOC charges on July 2, 2019, August 20, 2019, and October 22, 2019.  Accordingly, the Court will consider Defendants' other argument that Plaintiff cannot establish a prima facie case in relation to these complaints.

### 2.    Causation

Turning to causation, then, Defendants argue that Plaintiff has failed demonstrate that his protected activity is causally related to his suspension or demotion.  [Doc. 62-1 at 25-27.]  Defendants, relying almost entirely on a recent district court opinion—*Cisero v. ADT LLC of Delaware*, No. 1:19-CV-4319-SDG-CMS, 2021 WL 1712206, at *13 (N.D. Ga. Apr. 27, 2021), *report and recommendation adopted*, 2021 WL 4472977 (N.D. Ga. Sept. 30, 2021)[45]—argue that "where an employee complains *after* engaging in misconduct but before

---

[45] Defendants also string cite two other cases in support of this argument, *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 521 (11th Cir. 2007); *Hollan v. Web.com Grp., Inc.*, No. 1:14-CV-426-LMM-WEJ, 2015 WL 11237023, at *7 (N.D. Ga. Apr. 7, 2015), *report and recommendation adopted*, No. 1:14-CV-00426-LMM, 2015 WL 11237033 (N.D. Ga. July 1, 2015); however, those two cases were also string cited in the *Cisero* decision and Defendants offer no explanation for how they impact the argument.

discipline was instituted to create a retaliation claim," he cannot establish causation based upon very close temporal proximity.  [Doc. 62-1 at 24-27; Doc. 81 at 3-6.] Plaintiff, meanwhile, argues that various facts—for example, the opening of the OPS investigation days after he sent his February 2019 email; that Defendant Schierbaum was informed of Plaintiff's formal OPS complaint within hours by a telephone call from someone that used to work for him; that Plaintiff's own OPS complaint about discrimination was closed in a matter of days without a fulsome investigation; that Schierbaum recommended Plaintiff be suspended and demoted within 20 days of  Plaintiff's OPS complaint; and that he is the only non-probationary sergeant demoted since 1995—would allow a reasonable factfinder to conclude that his protected activity was causally related to his suspension and demotion.  [Doc. 67 at 16-20.]

In *Cisero*, the trial court observed the unremarkable fact that, for purposes of retaliation claims, "intervening events can negate the inference of causation that may arise from temporal proximity" between an employee's complaint and any adverse action following very close behind it.  2021 WL 1712206, at *14 (quoting *Hollan*, 2015 WL 11237023, at *21).  And because (1) the *Cisero* plaintiff "had documented ongoing behavior and performance issues that were present ***both***

***before and after*** Plaintiff started complaining of discrimination," and (2) others with those problems regularly received the "same discipline for performance and conduct" issues, the inference of causation that normally arises from close temporal proximity was defeated for purposes of establishing a prima facie case of retaliation. *Id.* at *13-14 (emphasis added).  But these same determinative facts—that the plaintiff engaged in the same problematic behavior both before and after she engaged in protected activity, and that other employees engaged in the same behavior were similarly treated—also distinguish *Cisero* from the present case. Defendants have not identified any performance or conduct problems that Plaintiff engaged in ***after*** the Georgia Tech incident and have not identified other employees with similar performance problems that were demoted; so without more, the *Cisero* holding has no application to defeating the causal element of Plaintiff's prima facie case created by close temporal proximity.[46]

---

[46] It may be that Defendants misunderstand the facts or holding in *Cisero*, as they characterize the substance of the case as one "where an employee complains *after* engaging in misconduct but before discipline was instituted to create a retaliation claim."  [Doc. 81 at 5 (emphasis in original).]  But *Cisero* makes clear that the causal inference was broken not because the employee complained after engaging in misconduct, but rather because of Plaintiff's "ongoing performance and conduct issues" that occurred ***after she made her complaint***, and it is those "intervening events that severed any possible inference of causation between [the] complaints and the issuance of her written discipline."  2021 WL 171220, at *14.

Defendants' other citations fare even worse.  In *Hankins*, the Eleventh Circuit found that the plaintiff's "flagrant act of misconduct"—namely, yelling at a coworker and threatening to "kick his ass"—defeated the temporal proximity between the employee's protected activity and termination precisely because it came ***after*** the plaintiff reported "suspected racial bias."  237 F. App'x at 521.[47]  In *Hollan*, similarly, it was only after the plaintiff engaged in protected activity—in that case, going out on FMLA leave—that the employer discovered that there were "serious" problems with her accounts and that she had apparently made false representations to a client.  2015 WL 11237023, at *6-8, 21.  What all these cases have in common are egregious, ongoing problems that take place after the plaintiff's protected activity, and which served to defeat the otherwise obvious inference of causation created by very close temporal proximity.  *See Holland*, 2015 WL 11237023, at *6-8, 21 ("[I]ntervening events can negate the inference of causation that may arise from temporal proximity.").[48]  But because Defendants do

---

[47]  A thorough discussion of other issues with the application and understanding of the *Hankins* decision may be found in *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1343-45 (S.D. Ala. 2012).

[48]  In their reply, Defendants also cite *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299 (4th Cir. 2006) and *Montgomery v. Board of Trustees of the University of Alabama*, No. 2:12-CV-2148-WMA, 2015 WL 1893471 (N.D. Ala. Apr. 27, 2015).  [*See* Doc. 81 at 6 n.4.]  As with Defendants' other cases, both

not point to any intervening conduct, discovery, or other event arising after Plaintiff's April 2019 OPS complaint (or indeed, after his February and March 2019 emails), there is nothing that would negate the normal causal inferences in created by very close temporal proximity between Plaintiff's April OPS complaint and Defendant Schierbaum's recommendation[49] that he be suspended and demoted the following month.

For the first time on reply, Defendants suggest that *University of Texas Southwestern Medical Center v. Nassar*, which clarified that "Title VII retaliation claims must be proved according to the traditional principles of but-for causation,"

---

involved misconduct that occurred after the plaintiff had complained, making them distinguishable from the present case. *See Francis,* 452 F.3d at 309 (after complaining that her USERRA rights were being violated, "co-workers lodged various complaints with the Department Project Manager regarding Francis' behavioral and attendance issues," which the company believed violated its employee conduct policy); *Montgomery*, 2015 WL 1893471 at *4 ("The undisputed attendance records and counseling documentation reflect UAB's serious concern about Montgomery's performance both before and after she complained of discrimination.").

[49] Defendants do not challenge Plaintiff's assertion that the relevant dates for determining temporal proximity are Plaintiff's formal OPS complaint on April 24, 2019, on the one hand, and Defendant Schierbaum's recommendations for Plaintiff's suspension and demotion, on the other. (*See generally*, Docs. 62-1 and 81.)  As a result, the undersigned accepts that recommendation as the relevant date of the adverse employment decision. *See Gilliam v. U.S. Dep't of Veterans Affs.*, 822 F. App'x 985, 990 (11th Cir. 2020) (treating date that supervisor recommended termination as the relevant point for temporal proximity analysis).

rather than the lesser burdensome "motivating-factor" standard applicable to Title VII discrimination claims, 570 U.S. 338, 360 (2013), somehow fundamentally changed the causation prong of the *McDonnell Douglas* framework for Title VII retaliation claims, and now requires that the Plaintiff prove—at summary judgment no less—"that his demotion would not have occurred but-for Schierbaum learning about Plaintiff's alleged discrimination claims." [Doc. 81 at 5.] Defendants provide no authority in support of the new requirement they seek to impose— almost a decade after *Nassar* was decided no less—nor how the Court should approach analyzing any evidence offered in support or opposition to the counterfactual hypothetical situation in which Defendant Schierbaum never learned about Plaintiff's complaints about discrimination. As the Eleventh Circuit has noted as late as 2013, *Nassar* "did not clarify the role of 'but for' causation in a plaintiff's prima facie case," *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 833 n. 2 (11th Cir. 2013), and this Court will not change the role set forth in decades of case law absent some authority on how to do so.

But even considering the substance of the argument, it is clear that is without support. In the first instance, it is "a long-recognized tenet of tort law that a plaintiff's injury can have multiple 'but-for' causes, each one of which may be

sufficient to support liability," *see Pearson v. Lawrence Med. Ctr.*, No. 5:12-CV-1064-CLS, 2012 WL 5265774, at *6 (N.D. Ala. Oct. 24, 2012), and that as a result, "[r]equiring proof that a prohibited consideration was the 'but-for' cause of an adverse job action does not equate to a specific burden to show that such consideration was the 'sole' cause" at summary judgment, *id.; see also Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (finding that to meet the but-for causation standard, a plaintiff need only provide evidence that "the employee's protected trait actually [had] . . . *a determinative influence on the outcome*"). Instead, for purposes of summary judgment, the but-for causation standard merely takes retaliation claims out of the realm of mixed-motive analysis. *See Hubbard v. Ga. Farm Bureau Mut. Ins. Co.*, No. 5:11-CV-290 CAR, 2013 WL 3964908, at *2 (M.D. Ga. July 31, 2013) (holding that the "heightened 'but-for' causation standard, however, does not change the Court's original reasoning" regarding causation within the prima facie case analysis at summary judgment); *see also Sims*, 704 F.3d at 1333 (reaffirming use of *McDonnell Douglas* framework for employment cases involving but-for causation).  And while it may be the case that Plaintiff cannot ultimately recover on his retaliation claim because he cannot persuade a jury that his protected activity was the but-for cause of his suspension and demotion, that is

a problem for the factfinder at trial. *See Kemp v. Gen. Growth Servs., Inc.*, No. 1:15-CV-01180-SCJ-AJB, 2016 WL 10988806, at *7 (N.D. Ga. Dec. 28, 2016), *report and recommendation adopted in relevant part,* 2017 WL 8217632 (N.D. Ga. Mar. 6, 2017) (holding that but-for causation standard did not impact the ability to maintain claims until trial); *Stidd v. Griffin Cap. Sec., Inc.*, No. 1:14-CV-3763-SCJ-JSA, 2016 WL 11664809, at *12 (N.D. Ga. May 31, 2016) (holding that inconsistent theories of recovery may be permissibly maintained until trial); *Allen v. S. Commc'n Servs., Inc.*, 963 F. Supp. 2d 1242, 1254 (N.D. Ala. 2013) (holding that "[r]egardless of whether any of Plaintiff's claims require but-for causation, he may certainly maintain alternative, inconsistent theories" and that "[i]t would be inappropriate . . . to grant summary judgment against Plaintiff on [a retaliation claim asserted under one statute] because he cannot recover under both [that statute] and Title VII retaliation").

Turning, then, to evidence of causation, Plaintiff contends that the following facts demonstrate that there is a triable issue of fact whether there was a causal connection between his protected activity and his suspension and demotion:

- Plaintiff's immediate supervisors around the time had praised him as highly effective (including his Captain, who signed his performance evaluation after the Georgia Tech kidnapping incident);

77

- In the immediate aftermath of the Georgia Tech kidnapping incident, Defendant Schierbaum told Plaintiff that GIS had failed him and that he (Defendant Schierbaum) wanted Plaintiff to continue on an upward trajectory;

- the formal investigation into Plaintiff's actions after the Georgia Tech kidnapping incident was opened just two days after he sent his February 2019 email complaining generally about biased investigations and possible discrimination;

- Plaintiff's March 2019 email complaining generally about discrimination among Plaintiff's chain-of-command was ultimately ignored by Chief Shields, despite her response indicating that she would meet with Plaintiff;

- After Plaintiff filed his formal OPS complaint alleging discrimination, the intake officer who received it called Defendant Schierbaum within hours to discuss the complaint with him, which Chief Shields testified was likely inappropriate;

- Chief Shields testified that with regard to Plaintiff's OPS complaint, "I also question – as diverse as our department was and you file a complaint and complaint against eight white employees, then I'm wondering where the issue really lies";

- Plaintiff's formal OPS complaint about discrimination in April 2019 was closed in a matter of days without an investigation, despite Shields testifying that "where there is discrimination, [] something more in depth would certainly be warranted";

- Defendant Schierbaum recommended Plaintiff be suspended and demoted within 20 days of the Plaintiff's OPS complaint; and

78

- Plaintiff was the only non-probationary sergeant demoted since 1995.

[Doc. 67 at 15-18.]  In response, Defendants assert that *Cisero*, following *Nassar*, precludes Plaintiff from establishing causation based solely on the 20-day proximity between his protected activity in filing the OPS complaint and Defendant Schierbaum's recommendation that Plaintiff be suspended and demoted; they do not otherwise attempt to undermine Plaintiff's other evidence as it pertains to the prima facie case.  [Doc. 81 at 4-6.]

As explained, Defendants appear to misunderstand the *Cisero* holding, and by extension, when temporal proximity can establish causation for satisfying a prima facie case of retaliation.  "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229 (11th Cir. 2011) (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).  And as the Eleventh Circuit has stated repeatedly in the years after *Nassar*, "a plaintiff may be able to rely solely on the temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality," so long as the proximity is "very close," usually less than two months.  *Ramirez v. Bausch &*

*Lomb, Inc.*, 546 F. App'x 829, 832 (11th Cir. 2013) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)); *see also Scott v. Sarasota Drs. Hosp., Inc.*, 688 F. App'x 878, 884 (11th Cir. 2017) (reaffirming that "[c]lose temporal proximity between an employee's protected conduct and the adverse action is generally sufficient to create a genuine issue as to whether there is a causal connection); *Williams*, 411 F. App'x at 229 (less than two months amounts to "very close"). Here, the requisite temporal proximity has been established by the "very close" 20-day period.[50]

And even if it were not, "where a plaintiff can establish a causal connection through 'other evidence tending to show causation,' a delay between the allegedly protected activity and the adverse activity is not fatal." *Ramirez*, 546 F. App'x at 832 (citing *Thomas*, 506 F.3d at 1364; *Wascura v. City of S. Miami*, 257 F.3d 1238,

---

[50] Although it was not cited by the parties, in *Drago v. Jenne*, the Eleventh Circuit stated that the "temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation," if the employer "contemplates an adverse employment action before an employee engages in protected activity." 453 F.3d 1301, 1308 (11th Cir. 2006) (citing *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006)). Of course, in this case, Plaintiff had already been transferred away from his position before engaging in protected activity, and there has been no evidence adduced or argument put forth tending to suggest Defendant Schierbaum or anyone else anticipated suspending or demoting Plaintiff when he filed his formal OPS complaint in April 2019. Accordingly, *Drago*'s holding is inapplicable.

1248 (11th Cir. 2001)).   Here, in addition to evidence of temporal proximity, Plaintiff has offered evidence tending to show that some of his supervisors thought he exceeded expectations; that Schierbaum did not initially fault Plaintiff for the Georgia Tech incident; that Chief Shields refused to meet with Plaintiff about alleged discrimination after saying she would; that after Plaintiff filed his formal OPS complaint, the intake officer and Defendant Schierbaum had a suspiciously timed phone call; that no comprehensive investigation into his OPS discrimination claims was conducted before the complaint was closed, despite Chief Shields's testimony that an investigation would be important; and that no other officers have been subject to the same discipline as Plaintiff in multiple decades.   None of these are smoking guns, but all are pieces of evidence that broadly support the notion that Plaintiff's protected activity was connected to his suspension and demotion.

Accordingly, for purposes of summary judgment, Plaintiff has met his burden of demonstrating a causal connection, and can therefore establish a prima facie case of retaliation.

### 3.    Legitimate Non-Retaliatory Reason and Pretext

Having made out his prima facie case retaliation, the burden shifts to Defendants to articulate legitimate, nonretaliatory reasons for Plaintiff's suspension and demotion.   This burden is one of production and is "exceedingly

light." *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1297 (11th Cir. 2021) (quoting *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1312 (11th Cir. 2016)).  Defendants have done so; according to them, Plaintiff "engaged in serious, extensive misconduct" and poor performance—in particular:

> failing to identify bullet holes and interview witness properly; repeatedly turning off his body worn camera; failing to document incidents or appropriately investigate why a person has a bullet wound in her hand; and letting people drive away in the crime scene without fingerprinting the vehicle and without obtaining appropriate witness statements—combined with Plaintiff's failure to accept responsibilities for his failures.

[Doc. 62-1 at.]  According to Defendants, these issues would have "warrant[ed] discipline for any APD sergeant." [*Id.*]  Under the *McDonnell-Douglas* framework, this suffices, and the burden shifts back to Plaintiff to show that the proffered reasons were pretext for discrimination.

In doing so, Plaintiff argues that a reasonable jury could conclude that the reasons provided by Defendants for his suspension and demotion were merely pretextual.[51]  To demonstrate pretext, a plaintiff must show enough "weaknesses,

---

[51] Plaintiff also briefly contends that she can also establish a "convincing mosaic of circumstantial evidence" to demonstrate retaliation and survive summary judgment.  [Doc. 67 at 32-33.]  An alternative to the *McDonnell Douglas* framework, "a plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Morgan v. Orange Cnty., Fla.*, 477 F. App'x 625, 628 (11th Cir. 2012) (quoting *Chapman*, 229 F.3d at 1024) (quotation marks omitted).

Even so, a plaintiff can rely on a wide variety of circumstantial evidence to prove that the employer's proffered reason for discharging him was pretextual and that the real reason was discriminatory or retaliatory in nature. *See Smith*, 644 F.3d at 1328-29 ("A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence

---

statements, or other information from which [retali]atory intent may be inferred, (2) "systematically better treatment of similarly situated employees," and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). But because she can establish a prima facie case of retaliation, there is little difference between the pretext analysis and the convincing mosaic analysis (*see id.*); and because Plaintiff also points to the same evidence in support of both pretext and the convincing mosaic analysis [*see* Doc. 67 at 19-33], the Court will address the arguments together.

that would allow a jury to infer intentional discrimination by the decisionmaker.'"). Indeed, the same circumstantial evidence supporting a prima facie case may be used in the pretext analysis. For example, temporal proximity is evidence of pretext, even if it does not establish pretext in isolation. *Jackson v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (finding a period of "no more than two weeks" as evidence of pretext). Thus, provided that there is sufficient evidence discrediting the employer's proffered reasons, the evidence supporting the prima facie case may be sufficient to survive summary judgment. *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1446 (11th Cir. 1998) (citing *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1426 (11th Cir. 1998)).

Plaintiff has presented numerous inconsistencies and weaknesses regarding Defendants' stated reasons for his suspension and demotion. First, Plaintiff highlights the fact that he received only praise and positive feedback from his immediate supervisors—Lieutenant's Genson and Brauninger, in particular—regarding his performance. Indeed, beyond rating Plaintiff overall as "exceeding expectations" in performance reviews, Lieutenant Genson testified that he thought Plaintiff was "extremely effective," was a good supervisor, was receptive to

84

feedback, and sought guidance when necessary; as Lieutenant Genson testified,[52]

he did not see any "red flags."  (PSAF ¶¶ 112; 114; R-PSAF ¶ 114.)  Lieutenant

Brauninger, meanwhile, testified that no one in his chain-of-command raised any

concerns to him about Officer Moore's performance or his ability to supervise other

officers at the time he became his supervisor, including Defendant Schierbaum and

Deputy Chief Glazier, (PSAF ¶ 30; R-PSAF ¶ 30; PSAF ¶ 119; R-PSAF ¶ 119),

and in the weeks preceding the Georgia Tech incident, Brauninger rated Plaintiff

as exceeding expectations once again (Brauninger Dep. 16).   And while the

evaluations' preparations predate the Georgia Tech kidnapping, the "highly

effective" rating was re-endorsed by Plaintiff's Captain on March 1, 2019 (PSAF

¶ 21; R-PSAF ¶ 21), well after the incident and Plaintiff's transfers.  Regardless,

such positive statements (and the accompanying lack of criticism communicated to

Plaintiff's immediate supervisors) still serve as evidence contradicting Defendants'

overall criticisms of Plaintiff as fundamentally incapable of basic policing.  *See*

---

[52] Defendants repeatedly attack the reliability of these performance reviews because Lieutenants Brauninger and Genson only had a short time supervising Plaintiff when they completed them.  However, Lieutenants Brauninger's and Genson's testimony during discovery—made after full periods supervising Plaintiff, and after the OPS investigations had been completed—largely corroborates their evaluations.

*Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1354 (11th Cir. 2022) (holding that, even when positive performance reviews predate alleged rule violations identified by the employer, they still "provide some basis for contradicting" the employers claims) (citing *Barthelus v. G4S Gov't Sols., Inc.*, 752 F.3d 1309, 1315-17 (11th Cir. 2014) for the proposition that positive performance reviews could create genuine issue regarding pretext "when the employer claimed that it fired the plaintiff for poor performance").

Were that not enough, there is no evidence that Plaintiff's chain-of-command even reviewed Plaintiff's performance evaluations (PSAF ¶¶ 183-85) or contacted Plaintiff's immediate supervisors in the aftermath of the Georgia Tech incident (Brauninger Dep. 41; Genson Dep. 24; PSAF ¶ 127). And while Defendants urge, first, that performance evaluations at APD were not very meaningful, and, second, that neither Brauninger nor Genson had a sufficiently long relationship with Plaintiff to give authoritative weight to their opinions; it is undisputed that immediate supervisors at APD, such as Genson and Brauninger, interact with their subordinates more than individuals higher up the chain-of-command, such as Chief Shields, Deputy Chief Glazier, or Defendant Schierbaum, and would have had better opportunities to more closely observe the work of their subordinates like

Plaintiff. (*See* PSAF ¶ 110.) Beyond that, Genson and Brauninger both supported their positive evaluations with testimony during discovery that came after their longitudinal supervising relationships Plaintiff were completed (*see*, *e.g.*, Brauninger Dep. 10 (standing by the statements in his evaluation)), and both were surprised to learn about Plaintiff's demotion (Brauninger Dep. 41; Genson Dep. 24; PSAF ¶ 127). As such, the foregoing facts also call into question Defendants' stated reasons for Plaintiff's suspension and demotion.

Related to the foregoing issues, it is undisputed that pursuant to APD policies, supervisors are encouraged to use counseling instead of formal complaints, and training as a tool before resorting to discipline. (PSAF ¶¶ 163-65.) This even includes remedial efforts for things such as handling calls and crime scene investigations. (PSAF ¶ 163, 166.) As Defendant Schierbaum has stated, "training is the life blood of what we do." (Schierbaum Dep. 151, Ex. 34.) And despite having training, mentoring, and other remedial tools at their disposal, Defendants did not recommend that Plaintiff receive refresher or remedial training; initiate the Early Intervention program[53]; or put him on a performance improvement plan at

---

[53] Under the program, an "Early Intervention Review may be initiated when any of the following conditions exist: . . . Any discernible pattern of repeated complaints or allegations against an employee which are similar in nature within a

any time during his tenure as Sergeant.  (PSAF ¶¶ 178-81.)  And while they now assert that they believed, at least as of early 2019, that Plaintiff was incapable of being trained or mentored, they do not explain when precisely they came to this realization or why Plaintiff was never given remedial supports at any time before 2019—for instance, in response to either of the first two incidents resulting in the 2017 and May 2018 OPS Complaints.[54]  And of course, Plaintiff's immediate supervisors opined that Plaintiff was responsive to feedback, and Plaintiff himself asked for remedial help as late as March 2019.  (*See* Glazier Dep. Ex. 26.) ("The proper recourse would be to develop a performance plan and mentor me with a more seasoned Lieutenant if in fact I was deficient.").  So while it is conceivable that training and mentorship might have been wasted on Plaintiff, a reasonable factfinder could still conclude that Defendants' refusal to consider any remedial training at any time—in the face of policies and practices (including by Defendant Schierbaum himself) to the contrary—also provides support for the notion that Defendants had ulterior motives for suspending and demoting him.  *Hutchinson v.*

---

twelve (12) month period …" or "behavior displayed by an employee which is so unusual or inappropriate, it creates an unsafe or disruptive work environment . . ." (Schierbaum Dep. Ex. 29 ¶ 4.1.3.)

[54] Schierbaum was aware of and used the Early Intervention Program for an officer in April 2018. (*Id.* 150, Ex. 30.)

*Sec'y, Dep't of Veterans Affs.*, 766 F. App'x 883, 888 (11th Cir. 2019) ("Departures from normal [policies and] procedures may be suggestive of discrimination.") (quoting *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) (internal marks omitted)); *Hurlbert*, 439 F.3d at 1299.

Adding to this evidence, Plaintiff next highlights that his demotion was virtually unused as a punitive or corrective tool for Sergeants.  (PSAF ¶¶ 130-32.) And while Chief Shields testified that discharge was a more common outcome (Shields Dep. 15), she also discharged only three sergeants during her entire tenure (PSAF ¶ 136), and according to APD records from 1999 forward, no one other than Plaintiff has been demoted for sustained violations of the "Responsibilities of Supervisors" work rule or for unsatisfactory performance (PSAF ¶¶ 142-33, 145-46).   Indeed, only one employee had been discharged for "responsibilities of supervisors," while most simply received a reprimand or a shorter suspension (four days on average).  (PSAF ¶ 141.)  Similarly, while eight employees were dismissed for unsatisfactory performance since 1999, none of them were discharged under Chief Shields, and the majority again received reprimands or shorter suspensions.  (PSAF ¶ 144.)  Finally, the three Sergeants who were discharged by Chief Shields were each dismissed for using unnecessary force or for firing at a civilian.  (PSAF

¶¶ 137-39.)  So while Plaintiff has not set forth evidence here of comparators that are "similarly situated in all material respects," or that could establish pretext in isolation, his statistics highlight how unusual it was that Defendants chose demotion as their corrective measure, whether or not it was unusually punitive.

Changing gears from evidence mostly undermining Defendants' stated reasons to evidence tending to establish that retaliation was the real motive, Plaintiff underscores (1) the suspicious timing of the formal OPS investigation into the Georgia Tech kidnapping incident, as well as when he received discipline relative to his complaints of discrimination; (2) dubious statements and communications from APD employees involved in his suspension and demotion; and (3) the handling of his own OPS complaint.

The most damning of these is the timing of key aspects of the investigation that resulted in Plaintiff's suspension and demotion.  Immediately following the Georgia Tech kidnapping incident, Plaintiff was transferred between shifts and then to the VIC, ostensibly to give him more support.  However, it was not until two days after Plaintiff emailed his chain-of-command that a formal OPS investigation was initiated into his handling of the incident, which resulted in his actual

demotion.[55]  More significantly, of course, is that Defendant Schierbaum issued his recommendation that Plaintiff be suspended and demoted less than three weeks after discovering Plaintiff had filed a formal OPS complaint asserting that Schierbaum had discriminated against Plaintiff, which helps establish not merely a prima facie case but also pretext.  *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 925-26 (11th Cir. 2018) (holding that "the suspicious timing of the termination," which came one week after the protected activity, was evidence of pretext); *see also Hurlbert*, 439 F.3d at 1298 (concluding that the "no more than two weeks" between a request for leave and the termination was evidence of pretext); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (up to seven weeks establishes a causal nexus).

Then, on top of all of this are a number of suspicious comments and actions that could allow a reasonable factfinder to conclude that Defendants were motivated by retaliatory animus.  First, in response to Plaintiff's March 2019 email

---

[55] While Plaintiff's February 2019 email was not protected under Title VII and Section 1981, the reaction to Plaintiff's general complaint of discrimination still provides insight into Defendants' motives.  *Cf. Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1436 (11th Cir. 1998) (collecting cases) ("A plaintiff can use evidence of time-barred discriminatory conduct to meet his burden of persuasion.").

complaining generally about discrimination by his chain-of-command, Chief Shields told Plaintiff that she would do her best to meet with him the following week. (*See* Shields Dep. Ex. 28.) Of course, she did not meet with Plaintiff, and the only explanation she offered was that she did not want to influence the outcome of the OPS investigation (Shield Dep. 77-78); however, the OPS investigation has been opened for several weeks when she responded, so she has still offered no explanation for why she informed Plaintiff that she would meet with him to discuss his concerns about discrimination in the first place. Worse still, when asked about Plaintiff's own OPS complaint accusing Defendant Schierbaum of discrimination, Chief Shields stated, "I also question – as diverse as our department was and you file a complaint and complaint against eight white employees, then I'm wondering where the issue really lies."[56] (Shields Dep. 83.) A reasonable factfinder could find that those statements tend to suggest Chief Shields was not honest with Plaintiff and unreasonably viewed him has the problem for raising concerns about discrimination within his chain-of-command. *Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999) ("Far from being a stray remark,

---

[56] Notably, just two weeks earlier, Plaintiff had received a performance evaluation rating him "highly effective" March 1, 2019. (PSAF ¶¶ 18, 21; R-PSAF ¶¶ 18, 21).

the comment may evince probative evidence of the state of mind of the decisionmaker at the time of [the plaintiff's] termination.")).

Then, after Plaintiff made his formal OPS complaint of discrimination in April 2019, the investigation into his allegations was closed before it even got off the ground, apparently in contravention of a number of policies and/or practices. For instance, complaints of racial discrimination are a "Priority I" complaint according to APD's "Disciplinary Process" policies, and should typically be investigated. (PSAF ¶¶ 73-75.) On this point, Lieutenant Zenelaj testified that even preliminary investigations include "obtaining statements, looking over immediate evidence they can get their hands on" and even pulling specific files referenced a complaint. (Zenelaj Dep. 43-45.) Despite this, Plaintiff's formal OPS complaint was classified as "Received Not Open" less than a week after it was filed, all without any investigation by OPS beyond reviewing some of the files Plaintiff referenced.[57] (Kramer Dep. 23-30.) Making this worse, less than four hours after receiving Plaintiff's formal OPS complaint, the intake OPS officer, Sergeant

---

[57] As mentioned previously, an annual OPS report from 2019 appears to require contradictory physical evidence to avoid investigating allegations. (PSAF ¶ 78; *see also* Kramer Dep. Ex. 3.) Chief Shields also testified that the complaint should have been investigated, if only to show that race was not a motivating factor in any adverse actions. (PSAF ¶ 95; Shields Dep. 94-95.)

Kramer, called Defendant Schierbaum, who he had previously worked under, and likely discussed the complaint, which Chief Shields admitted would have been inappropriate. (PSAF ¶¶ 69, 70; R-PSAF ¶ 69; Shields Dep. 91-92.)

Finally, Chief Shields testified that it was improper for Defendant Schierbaum to have even reviewed the 2019 OPS Complaint file and recommended discipline after learning of Plaintiff's OPS complaint about him in April 2019:

> So if Major Schierbaum was receiving this [OPS Complaint] and knew [Plaintiff] had an open complaint against him in OPS or even if it wasn't open, I would say -- I wouldn't want to -- I think it would've been appropriate to have recused himself from reviewing the file certainly.

(Shields Dep. 98-99.) As a result, it appears that under APD's practices, Defendant Schierbaum should never even have been involved in Plaintiff's discipline, but was nevertheless allowed to recommend Plaintiff's suspension and demotion less than a month after he accused Schierbaum of discrimination.

To be sure, the foregoing facts are amenable to a variety of interpretations. On the one hand, faced with this evidence, a factfinder could decide that Plaintiff was involved in a series of investigatory and supervisory mishaps during his time as Sergeant, and that APD demoted him in an effort to retain an employee in a position where they thought he could succeed. But on the other hand, a reasonable

factfinder could view the temporal proximity and other suspicious pieces of evidence and conclude that Plaintiff was an effective Sergeant, as his immediate supervisors had; that he made a good faith complaint that he was being discriminated against based upon the abrupt transfers he experienced in 2019; but that his chain-of-command—in particular, Defendant Schierbaum and Chief Shields—decided that demotion was the most expedient way of responding to the situation, despite policies and practices calling for more lenient and remedial measures first.  But at this point, the Court must view the evidence in the light most favorable to Plaintiff, and need only decide whether a jury could reasonably conclude that retaliation occurred.  Because of this, the Court finds that Plaintiff has put forth sufficient to create a material question of fact regarding pretext, and that a reasonable jury could conclude Defendants' reason for terminating Plaintiff's employment was actually retaliation for having filed his OPS complaint of discrimination.  !

**D.    The City's Section 1983 Liability**

In its final argument, Defendants contend that Plaintiff has not established municipal liability under Section 1983, and that his retaliation claim against the

City under Sections 1981 and 1983 is therefore subject to summary judgment. [Doc. 62-1 at 29-33.]

The Supreme Court has placed strict limitations on municipal liability under Section 1983. *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). A municipal entity, like the City in this case, cannot be held liable under Section 1983 "simply because its agent causes an injury, even a constitutional injury." *Gilmere v. City of Atlanta*, 737 F.2d 894, 902 (11th Cir. 1984); *see also Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000) (holding that Section 1983 do not incorporate *respondeat superior* liability). Instead, a plaintiff bringing a claim under Section 1983 "must show a municipal custom, policy, or practice caused" the retaliation underlying the claim, *Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015) (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009)), which ensures "municipal liability is limited to [only those] action[s] for which the municipality is actually responsible," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). To adequately establish a municipal custom or policy, then, a plaintiff must show either that: (1) the municipality had an express policy in place, (2) there was a widespread practice that was so permanent and well-settled as to constitute a custom and usage with the force of law, or (3) the decision at the

96

center of the claim was made by a municipal official with final policy-making authority.  *See Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966, 968 (11th Cir. 2002); *see also Howard v. City of Robertsdale*, 168 F. App'x 883, 890 (11th Cir. 2006) (citing *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1307 (11th Cir. 2001)).

In this case, it appears undisputed that Plaintiff seeks to hold the City liable via the third option, asserting that his demotion was made by an official with final policy-making authority.  [See Doc. 1, Count III; *see also* Doc. 67 at 34.]  However, as Defendants rightly point out, the Eleventh Circuit has "repeatedly recognized that 'a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review.'"  *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1190 (11th Cir. 2019) (citing *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997)).  Thus, "where there is an opportunity for the plaintiff to appeal an official's decision to a reviewing board, such review is generally sufficient to find that the official was not the final policymaker."  *Id.* (citing *Scala v. City of Winter Park*, 116 F.3d 1396, 1403 (11th Cir. 1997)).  Indeed, "the existence of a reviewing board has generally been sufficient to find that the official in question did not have final

policymaking authority."  *Maschmeier v. Scott*, 269 F. App'x 941, 944 (11th Cir. 2008) (citing *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003); *Morro*, 117 F.3d at 514; *Scala*, 116 F.3d at 1402-03)).  Still, a plaintiff can attempt to show that the review was not meaningful, but rather serves as the "conduit of the subordinate's improper motive" if the review merely "adopt[s]" or "'rubber-stamps' the recommendation of a subordinate."  *Quinn*, 330 F.3d at 1326 (quoting *Hitt v. Connell*, 301 F.3d 240, 248 (5th Cir. 2002)).

Defendants contend that because final decision-making authority for Plaintiff's suspension and demotion resides with the CSB, Plaintiff cannot hold the City liable for Defendant Schierbaum's recommendation or any of his chain-of-command's concurrence with or enforcement of that recommendation.  In response to Defendants' argument, Plaintiff very briefly argues that "[b]y refusing to even consider whether retaliation was the cause of Moore's demotion, the CSB, as a practical matter, was a rubberstamp for Defendants' retaliatory demotion of Moore." [Doc. 66 at 34.]

Even considering Plaintiff's conclusory, two-sentence argument, *see Phillips v. May*, 838 F. App'x 445, 449 (11th Cir. 2020) (affirming summary judgment in Section 1983 case when plaintiff provided "conclusory statements, and

no evidence" regarding final decisionmaking authority), it fails.  For starters, the only evidence Plaintiff cites is a single unexplained statement made during the course of his proceedings before the CSB, in which someone affiliated with the CSB noted at the beginning of the hearing that "the Civil Service Board does not have the authority to rule on or resolve any discrimination claims."  [*See* Doc. 66-10.]  Neither party explains who made this statement or any context for it, and as a result, its probative value is close to nothing.  But regardless, Plaintiff's single piece of evidence is limited by its own terms to discrimination claims (which are no longer in dispute in this case), and says nothing whatsoever about the CSB's authority to rule on or resolve retaliation claims, nor anything about whether CSB's review of the suspension and demotion recommendations in the present case was meaningful.  And even if the CSB did not consider Plaintiff's allegations of discrimination and retaliation in the course of its review of the relevant employment decisions, Plaintiff does not dispute that it heard witnesses, deliberated, and issued its own findings and decision, which is all the meaningful review requires.  *See Lopez v. Gibson*, 770 F. App'x 982, 993 (11th Cir. 2019) ("Sheriff Gibson's demotion of Lopez was subject to meaningful administrative review by the Appeals Board, which heard witnesses, deliberated, and issued its own fact findings and

decision.").  Indeed, Plaintiff points to nothing to suggest that the CSB could not have reversed the suspension or demotion decisions even without ruling on Plaintiff's allegations of discrimination or retaliation; that is, Plaintiff's evidence is fully consistent with CSB being able to reverse any improperly made decision. So, without some meaningful evidence or authority that the CSB in fact rubber-stamped Defendant Schierbaum and the chain-of-command's determination that Plaintiff be suspended and demoted, his retaliation claim against the City under Sections 1981 and 1983 fails.

## IV.  CONCLUSION

For the foregoing reasons, it **RECOMMENDED** that the motion for summary judgment be **GRANTED IN PART AND DENIED IN PART**.  [Doc. 62.]  Summary judgment should be **GRANTED** on all of Plaintiff's discrimination claims, as well as on his retaliation claim against the City under Sections 1981 and 1983 and his request for punitive damages against Defendant Schierbaum. Summary judgment should be **DENIED** as to Plaintiff's retaliation claims— against the City under Title VII and against Defendant Schierbaum under Section 1981—as they pertain to his suspension and demotion.

IT IS SO RECOMMENDED this 19th day of December, 2022.

_____

JOHN K. LARKINS III
United States Magistrate Judge